## SOUTHERN PACIFIC RAILROAD COMPANY *v.* UNITED STATES.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 71. Argued December 2, 3, 1896. — Decided October 18, 1897.

The cases of *United States v. Southern Pacific Railroad*, 146 U. S. 570, and *United States* v. *Colton Marble and Lime Co.* and *United States* v. *Southern Pacific Railroad*, 146 U. S. 615, held to have adjudged, as between the United States and the Southern Pacific Railroad Company:

(1) That the maps filed by the Atlantic and Pacific Railroad Company in 1872 were sufficient, as maps of definite location, to identify the lands granted to that company by the act of Congress of July 27, 1866, c. 278, 14 Stat. 292;

(2) That upon the acceptance of those maps by the Land Department, the rights of that company in the lands so granted, attached, by relation, as of the date of that act ; and,

(3) That in view of the conditions attached to the grant, and of the reservations of power in Congress contained in the act of 1866, such lands became, upon the passage of the act of July 6, 1886, c. 637, 24 Stat. 123, forfeiting the lands granted to the Atlantic and Pacific Railroad Company, the property of the United States and by force of that act were restored to the public domain, without the Southern Pacific Railroad Company having acquired any interest therein that affected the ownership of the United States.

1

A right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies ; and even if the second suit is for a different cause of action, the right, question or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified.

The 45th Rule of Equity, providing that " no special replication to any answer shall be filed," and that " if any matter alleged in the answer shall make it necessary for the plaintiff to amend his bill, he may have leave to amend the same with or without payment of costs, as the court, or a judge thereof, may in his discretion direct," means, at most, that a general replication is always sufficient to put in issue every material allegation of an answer or amended answer, unless the rules of pleading imperatively require an amendment of the bill; and such an amendment is not required in order to set out that which may be used simply as evidence to establish any fact or facts put in issue by the pleadings.

Where a former recovery is given in evidence, it is equally conclusive, in its effect, as if it were specially pleaded by the way of estoppel.

This suit was brought by the United States to quiet its title to a large tract of land in California, acquired under the treaty of Guadalupe Hidalgo, and now set apart by act of Congress and the President's proclamation, issued thereunder, as part of a public reservation.

The facts involved, and the legislation affecting the rights of the respective parties, do not vary materially from those set forth in *United States* v. *Southern Pacific Railroad*, 146 U. S. 570.

In view of the full statement there, and of the still fuller statement in the opinion of the court in this case, it is sufficient, for the purpose of understanding the argument of counsel reported below, to give the following facts:

1. By the act of July 27, 1866, c. 278, 14 Stat. 292, Congress created a corporation called the Atlantic and Pacific Railroad Company ; authorized it to construct a railroad from Missouri to the Colorado River, and thence, across the State of California, to the Pacific; and made a grant of public lands to aid in the construction of that railroad. In the same act it further authorized the Southern Pacific Railroad Company to connect with the Atlantic and Pacific Railroad at or near the boundary of California; and it made similar grants

to the Southern Pacific Railroad Company, to aid in its construction.

2. Under the act of July 27, 1866, the Atlantic and Pacific Company constructed a part of its road, but did no work west of the Colorado River, the east line of the State of California.

3. By the act of March 3, 1871, c. 122, 16 Stat. 573, the Southern Pacific Company was authorized to construct a railroad by way of Los Angeles to the Texas Pacific Railroad at or near the Colorado River, "with the same rights, grants and privileges, and subject to the same limitations, restrictions and conditions, as were granted to said Southern Pacific Railroad Company of California by the act of July 27, 1866, provided, however, that this section shall in no way affect or impair the rights, present or prospective, of the Atlantic and Pacific Railroad Company."

4. The Southern Pacific Company constructed such contemplated railroad, and claims in this suit that the lands in dispute passed to it under the act of 1871.

5. By the act of July 6, 1886, c. 637, 24 Stat. 123, entitled "An act to forfeit the lands granted to the Atlantic and Pacific Railroad Company," etc., it was enacted "that all the lands, excepting the right of way and the right, power and authority given to said corporation to take from the public land adjacent to the line of said road material of earth, stone, timber and so forth, for the construction thereof, including all necessary grounds for station buildings, workshops, depots, machine shops, switches, side tracks, turn-tables and water stations, heretofore granted to the Atlantic and Pacific Railroad Company by an act of Congress entitled 'An act granting lands to aid in the construction of railroad and telegraph lines from the States of Missouri and Arkansas to the Pacific Coast,' approved July twenty-seventh, eighteen hundred and sixty-six, and subsequent acts and joint resolutions of Congress which are adjacent to and coterminous with the uncompleted portions of the main line of said road, embraced within both the granted and the indemnity limits, as contemplated to be constructed under and by the provisions of said act of July twenty-seventh, eighteen hundred and sixty-six, and acts and

joint resolutions subsequent thereto and relating to the construction of said road and telegraph line be, and the same are hereby, declared forfeited and restored to the public domain."

6. On April 3, 1871, the Southern Pacific Company filed a map of its route from Tehachapa Pass to the Texas Pacific Railroad, and proceeded to construct its road, and finished the entire construction in 1878. The road crossed the line of the Atlantic and Pacific Company as located. The lands in controversy in the cases reported in 146 U. S., 570 and 615, were within the granted or place limits of both the Atlantic and Pacific Company and the Southern Pacific Company, at the place where the lines crossed each other. The Southern Pacific Company claimed that as it had constructed its road, and as the other company had not done the same, the lands became its property. It was to test this claim of title, and to restrain trespasses by the railroad company and those claiming title under it, that the suits reported in 146 U. S. were instituted.

7. The decisions in those cases were adverse to the Southern Pacific Company. This court held, as stated in the head note, that the Atlantic and Pacific Railroad Company, having duly filed a valid and sufficient map of definite location of its route from the Colorado River to the Pacific Ocean, which was approved by the Secretary of the Interior, the title to the lands in dispute passed thereby to that company under the grant of July 27, 1866, and remained held by it, subject to a condition subsequent, until their forfeiture under the act of July 6, 1886; and that by that act of forfeiture the title thereto was retaken by the United States, for its own benefit, and not for that of the Southern Pacific Railroad Company, whose grant never attached to the lands, so as to give that company any title of any kind to them.

8. Then this suit was brought, in which the principal contention on the part of the United States was that the lands in dispute are in the same category, in every respect, with those in controversy in the cases reported in 146 U. S.; and that, so far as the question of title is concerned, the judgments in those cases conclusively determined, as between the United States and the Southern Pacific Railroad Company

and its privies, the essential facts upon which the Government rests.

9. In the former cases the United States insisted that the controlling matter was, whether the maps of location, filed by the Atlantic and Pacific Railroad Company in 1871, and which were accepted by the Land Department as sufficiently designating that company's line of road, under the act of July 27, 1866, were valid as maps of definite location. The United States contended that they were maps of that character. The Southern Pacific Company contended that they were not. The issue so made was determined in favor of the United States. In this case the United States insisted that, it having been so determined, and the lands here in dispute being within the limits of the line of road so designated, it was not open to the Southern Pacific Company to question the result reached in the suits reported in 146 U. S. Such maps, it was claimed, sufficiently identified the lands granted by Congress to the Atlantic and Pacific Railroad Company by the act of 1866, and were therefore valid maps of definite location.

*Mr. Joseph H. Choate* (with whom were *Mr. J. Hubley Ashton* and *Mr. Charles H. Tweed* on the brief) for appellants.

The lands involved in this suit are within the limits which would have appertained to a grant to the Atlantic and Pacific upon the 1872 route, if that had been an authorized route, and if a definite location had been duly made thereon so as to attach the grant to specific lands.

I. The decrees in the former cases decided by this court in 1892, 146 U. S. 570, 615, are not conclusive in this suit in favor of the United States, either as *res judicata*, or as an estoppel, or as evidence.

(*a*) The causes of action are different, and the judgment in the former action can operate as an estoppel only as to the point or question actually litigated and determined, and not as to other matters which might have been litigated or determined, according to the principle emphatically decided by this court

in *Cromwell* v. *Sac County*, 94 U. S. 351 ; *Davis* v. *Brown*, 94 U. S. 423 ; *Nesbit* v. *Riverside Independent District*, 144 U. S. 610 ; *Wilmington & Weldon Railroad* v. *Alsbrook*, 146 U. S. 279, 302 ; *Keokuk & Western Railroad* v. *Missouri*, 152 U. S. 301, 314, 315 ; *Last Chance Mining Co.* v. *Tyler Mining Co.*, 157 U. S. 683, 687 ; *Roberts* v. *Northern Pacific Railroad*, 158 U. S. 1, 27, 28, 29.

The main question or point presented for determination in the present case was neither litigated nor determined in the former cases.

We ask the judgment of the court in this case upon new questions of law, arising upon new and different facts.

Stated generally, the decision of the court in the former case against the contention of the defendants was, that, notwithstanding the fact that the line shown upon the four maps of the Atlantic and Pacific Company was a line from the Needles to San Francisco, this was a valid designation of line between the Needles and San Buenaventura, and was not invalid and ineffectual because the line claimed extended from the Needles to San Francisco; that the grant to the Atlantic and Pacific Railroad Company took effect upon the lands in dispute in that suit by relation as of the date of the grant, when (as was assumed in that case) that company filed maps of definite location ; that therefore the subsequent grant to the Southern Pacific did not embrace those lands, but they were excluded or excepted from it, so that, when the lands in California claimed in that case adjacent to the unconstructed portion of the Atlantic and Pacific were declared forfeited and restored to the public domain by the act of Congress of 1886, the Southern Pacific, whose grant but for the prior grant to the Atlantic and Pacific would have embraced the same lands, took nothing under its grant by reason of the forfeiture.. In passing upon the above questions this court treated the Atlantic and Pacific Maps of 1872 as *bona fide* maps of definite location. The question then litigated was, whether the Atlantic and Pacific had the right to locate a line to San Francisco, or, if not, whether the location was valid between the Needles and San Buenaventura.

Stated generally, the claim of the defendants here is that the Atlantic and Pacific never did file any maps of definite location of a railroad in California; that the maps which they did file, indicating in a rude and wholly inaccurate way a line opposite the lands in question here, were in no sense maps of definite location, were at the best a mere general designation of route, and that therefore the grant to the Atlantic and Pacific never did attach to the lands within the withdrawal limits opposite this line, or to any specific lands in the State of California, and that they were therefore not excluded or excepted from the grant of 1871 to the Southern Pacific, which, by virtue of its designation of general route, and building the road, and filing maps of definite location, became the absolute owner of the lands within the prescribed limits opposite thereto, under that grant.

It is thus manifest at the first blush that the question of the *bona fides* of the maps of the Atlantic and Pacific, as maps of definite location, and the *bona fides* of any claim that these should be so regarded, was never litigated or determined in the former actions. A critical analysis of the proceedings, and the decision in the former actions, makes this absolutely certain.

The three objections raised by the defendants to the validity of the alleged designation of the Atlantic and Pacific line were overruled by the court. These objections were: 1. That the maps were filed at different times, in sections, of segments of its proposed route. 2. That these maps were filed in the office of the Secretary of the Interior instead of the General Land Office; and 3. (which was the objection mainly relied upon), That the route, as originally designated, ran to San Francisco as the ultimate objective point, instead of by the most eligible and practicable route from the Needles to the Pacific Ocean, as prescribed in the act.

These questions as to the validity and effectiveness of the designation of route were raised, discussed and determined adversely to the defendants.

There was, however, no issue in that case as to whether the maps of 1872 were or were not valid maps of definite loca-

tion, as distinguished from maps of preliminary location or designation of route.

We submit that, from the opinion of the court in the former actions, it is beyond dispute that the point now raised by the defendants appears distinctly not to have been litigated or determined, and, the cause of action being different in the present action, the defendants are not by the former judgment precluded from maintaining the ground on which they now stand, namely, that the Atlantic and Pacific Company never did locate, that is, definitely locate its line west of the Colorado River, and that the grant to that company never did take effect upon the lands in suit, or any other specific lands in the State of California, and that there is therefore nothing to interfere with the passage of the title to the Southern Pacific Company.

(b) But if we look behind the final decision in the court of last resort to the pleadings as set forth in the former cases, we shall find that the point now relied on was not then put in issue or raised, which is fatal to any claim of *res judicata* or estoppel. *Cromwell* v. *Sac*, 94 U. S. 353 ; *Davis* v. *Brown*, 94 U. S. 428; *Johnson Co.* v. *Wharton*, 152 U. S. 261. A judgment against a plaintiff who would have had to establish several facts to maintain his case, is not an estoppel as to any specific fact, unless that specific fact was actually litigated. *Long* v. *Baugas*, 2 Ired. (Law), 290; *Angel* v. *Hollister*, 38 N. Y. 378.

It appears from the pleadings in that suit that there was no claim on the part of the complainant that the maps referred to were maps of definite location, but that they were merely maps designating a general route ; that the defendant claimed that these maps did not have the effect of properly locating the road under the act and giving title to the Atlantic and Pacific, not because they were not in fact maps of definite location, were not filed or approved as such, were not *bona fide* maps at all, or because the contents of the certificates appended to the maps were false, but for the reasons that they were filed in sections, and when all the sections were filed showed a proposed route to San Francisco (which

was claimed to be a wholly unauthorized line) instead of a line from the Needles, by the most practicable and eligible route to the Pacific, which the act contemplated and expressly prescribed. These were the points in respect to the maps, and the only points which were litigated and judicially determined in the case.

It distinctly appears that, under the issues framed in the former actions, only questions of law were litigated and determined, and no issue of fact as to whether the Atlantic and Pacific Company ever filed maps of definite location was tried or actually litigated at all. Yet the real question of fact now presented was not in any way before the court; and, although all the questions of law involved in the former cases are here involved, there is also here in this action a new issue of fact as to the character and *bona fides* of the maps filed, and a new question of law as to the effect of their character or of their falsity.

It is quite true, as pointed out by this court in its opinion in the prior cases, that the purpose of the litigation by the Government was to procure an adjustment and determination of the extent of its grant to the Southern Pacific Railroad Company, and, if it had included all the land covered by the grant in the same suit, the adjudication would necessarily have been final. If all the eggs had been put into one basket, the company through undue confidence in the safety of its position, or its slip in respect to ascertaining where the real strain existed, might have lost all; but, as only a portion were put at risk in the former cases, it is entitled to save the rest. While, of course, the court did decide, upon the pleadings and evidence before it in those cases, that the lands were lost to the Southern Pacific on account of the vesting of title in the Atlantic and Pacific, it made such decision only as to the lands which were involved in that controversy. While assuming (as it was entitled to do in that case) that a good and sufficient map of definite location was filed by the Atlantic and Pacific Company; it is certainly demonstrable from the record and the opinion that it did not hold it to be good and sufficient against objections not then presented, and

which are now raised for the first time upon wholly new evidence.

The proposition that this court in the former actions in deciding that the title vested in the Atlantic and Pacific, and under them in the complainant, necessarily decided every fact and every question of law involved in the title, is true only in respect to the title of the lands there in controversy; and, if we are right in claiming that a suit for these lands is another cause of action, the proposition has no relevancy here. *Eastman* v. *Cooper*, 15 Pick. 276; *Sawyer* v. *Woodbury*, 7 Gray, 499, 502; *King* v. *Chase*, 15 New Hampshire, 9.

(c) No estoppel by former judgment can arise until the former judgment is pleaded, provided there is an opportunity to plead it. The Government has not seen fit to plead any former adjudication as an estoppel, although it had ample opportunity so to do in this cause. An estoppel by a former judgment must be pleaded, if there is an opportunity to plead it, and the failure to plead it, if there is an opportunity to plead it, waives the estoppel. *Fanning* v. *Hibernia Ins. Co.*, 37 Ohio St. 344; *Grey* v. *Pingry*, 17 Vermont, 419, 44 Am. Dec. 345; *Blood* v. *Marcuse*, 38 California, 590; *Isaacs* v. *Clark*, 12 Vermont, 692, 36 Am. Dec. 372; *Hanson* v. *Buckner*, 4 Dana, 251; *Glenn* v. *Priest*, 48 Fed. Rep. 19.

The same rule applies to estoppel by written contract. *Mabury* v. *Louisville & Jeffersonville Ferry Co.*, 60 Fed. Rep. 645; *Wood* v. *Austram*, 29 Indiana, 177; *Robbins* v. *Magee*, 76 Indiana, 381; *Cole* v. *Lafontaine*, 84 Indiana, 446; *Stewart* v. *Beck*, 90 Indiana, 458.

It having been shown that a former judgment is not an estoppel unless pleaded, provided there is an opportunity to plead it, the question arises: Was there an opportunity, in this case, to plead the former judgment?

Rule 45 of the Rules of Equity provides: "No special replication to any answer shall be filed. But if any matter alleged in the answer shall make it necessary for the plaintiff to amend his bill, he may have leave to amend the same with or without the payment of costs, as the court or a judge thereof may in his discretion direct."

The appellees here, plaintiffs below, availed themselves of the provisions of Rule 45; obtained leave of the court to, and did, amend their bill September 25, 1891. The defendant's answer to this amended bill, filed June 12, 1893, set up title in them for these lands in virtue of its land grants from Congress; specially pleaded that the Atlantic and Pacific Company did not definitely locate its railroad in California, and that the maps filed by it were fraudulent pretences; but the plaintiffs did not, by amended bill, plead the former judgment, as they might have done. There can be no doubt, therefore, that, although the plaintiffs did not plead the former judgment, they had full opportunity to plead it.

The provisions of Section 101 of the Ohio code closely resemble Rule 45 of the Rules of Equity. It provides, however, that the plaintiff may reply by answer to the new matter set up by the defendant, while Rule 45 provides that the plaintiff may reply to such new matter by amendment of the bill. In the case of *Fanning* v. *Ins. Co.*, 27 Ohio, 344, the single question was submitted and determined whether the plaintiff might introduce in evidence a former judgment between the same parties, upon the same demand and cause of demand, the plaintiff having answered without pleading the former judgment. The court, in deciding the case, said: "The former adjudication is new matter, which the Code Practice requires should be pleaded. It is matter *ex post facto*, and should be specially pleaded, so that the court may, as matter of law, determine as to its effect. This was the settled rule at common law whenever there was an opportunity to plead such former adjudication. The code having furnished that opportunity to plead it, we think the record was inadmissible as evidence."

In the case of *Wilson* v. *Stolley*, 4 McLean, 275, the court distinctly held that under Rule 45 the matter which at common law should be set up by replication must be set up by amendment to the bill; and at page 277 said: "The 45th rule of chancery practice declares that 'no special replication to any answer shall be filed. But, if any matter alleged in the answer shall make it necessary for the plaintiff to amend

his bill, he may have leave to amend the same.' As a special replication is not allowed, the question of abandonment can only be brought before the court by an amendment of the bill."

The sense of all which is that, wheresoever the plaintiff was formerly required to present matters by replication, he is now required by Rule 45 to present such matters by amendment to the bill; and, failing so to present such matters, he cannot be heard in evidence as to them.

(*d*) Another rule well settled in respect to estoppel by former judgment is that, if such estoppel exists, it may be waived by the plaintiff's introduction of evidence as to the truth of the matters claimed to have been decided in the former case.

The plaintiff in this case has introduced proof of facts upon which the former adjudication was determined. It therefore cannot rely upon the judicial adjudication of the issue by way of estoppel in the former cases.

The necessary legal effect of the estoppel is to preclude all inquiry as to the truth of the matter determined, and when a party who is entitled to set up an estoppel does open inquiry into the truth of the matter, he cannot complain that the other party pursues it without regard to the estoppel.

If the plaintiff lets down the bar of the estoppel, he must permit the defendant to follow his lead into the field of evidence. *Megerle* v. *Ashe*, 33 California, 74; *Philadelphia, Wilmington &c. Railroad* v. *Howard*, 13 How. 307; *Mack* v. *Levy*, 60 Fed. Rep. 751.

And to the same effect will be found the decision in the case of *Kilheffer* v. *Herr*, 17 Serg. & Rawle, 319, 17 Am. Dec. 661.

The Circuit Court, in determining this case, ignored the former decision, and upon the main issue found substantially that the Atlantic and Pacific Company never did definitely locate its railroad in California, and found the same maps which were before the Supreme Court in the former case to be fraudulent pretences, which amounted at most to but a general designation of its contemplated route. Upon these

findings of facts, as will be shown later, the decree should have been for appellants. And it follows that had the appellees relied on an estoppel the decree would have been against them, because the court could not have reached the facts without first finding against the estoppel. So, in either event, whether the plaintiffs relied on the estoppel or on the truth of the matters, the decree should have been against them.

This, it seems to us, fully disposes of the influence of the former case upon this — considered as to each and every relationship which a former suit can sustain to a subsequent suit.

II. The evidence contained in the record now before the court conclusively shows that the basis of fact on which this court rested its judgment in the former actions never existed, and that in truth the Atlantic and Pacific Railroad Company never did definitely fix, or definitely locate, the line of its road west of the Colorado River, and never filed a map of definite location in California; that the maps which it did file in 1872, showing the route of a proposed line opposite the lands in controversy in this suit, were not maps of definite location, but were at best only maps designating a general route.

As a consequence, we insist with confidence that the grant to the Atlantic and Pacific Company never did take effect; never did attach to the lands in suit or to any other lands in California; and that, therefore, in accordance with the principles laid down in the former decision, the lands passed to the Southern Pacific Railroad Company under its grant upon the construction of its road, and the filing of maps showing its constructed line.

(*a*) There can be no question as to what the law requires to constitute a definite location under a railroad land grant, which shall have the effect of specifically locating the line of the road from which the measurement of the alternate sections granted shall be made.

The object of the Government in making a land grant in every case is to secure the building of the railroad as a public object; the lands granted are in each case to be in alternate

sections immediately adjacent to the railroad as it shall finally be constructed; and, until the precise line on which the railroad is to be built is definitely determined by the company and communicated to the Government, the grant is a mere float.

The route of the railroad is considered to be definitely fixed when "the necessary determinative lines have been fixed on the face of the earth," that is to say, when the company has made its preliminary and final surveys, staked its line upon the ground, and communicated to the Government, by filing a map of the same, its final determination as to the precise line upon which the road is to be built. It is only when this has been done that the line of the road is definitely fixed.

It is settled by *Kansas Pacific Railway* v. *Dunmeyer*, 113 U. S. 629, and *Sioux City &c. Land Co.* v. *Griffey*, 143 U. S. 32, that a definite location is the result of an actual examination and survey of the route, and the fixing of determinative lines on the face of the earth; locating it over the very ground on which it is intended to build the railroad. The term cannot be satisfied by a line drawn at random over the face of the country, without regard to mountains or valleys, or the other features of topography by which the practicability of a route can be determined.

(*b*) The rule that land grants do not attach to any specific lands at any time prior to the definite location of the line, applies, in all its force, to the grant made to the Atlantic and Pacific Railroad Company by the act of July 27, 1866; and if, as we claim is clearly shown by the evidence in this case, the Atlantic and Pacific road was never definitely located, the grant to that company never vested or became attached to any specific lands, but remained a float until the passage of the forfeiture act, which terminated its existence even as a float.

(*c*) Considering it then as settled for all purposes of the case that a *bona fide* map of definite location adopted by the company as its finally and definitely fixed line of road, from which there would be no change without legislative consent, was the essential and indispensable thing by which only the

grant to the Atlantic and Pacific Company could attach to the lands, if it could attach at all before actual construction, we submit that it is conclusively established by the evidence in this case that no such map ever existed or was filed, no definite location was adopted by the company, and no such definite location was approved by the Secretary of the Interior, and that therefore no title to the lands in dispute ever vested in that company; but, coming within the terms of the grant to the Southern Pacific, they became its property upon the construction of its road and the filing of its maps of definite location as the construction proceeded.

By the act of 1866 the Atlantic and Pacific was authorized to construct a continuous railroad from Springfield, Missouri, by the route laid down in the act, to the Colorado River, at such point as might be selected by that company for crossing, and thence by the most practical and eligible route to the Pacific Ocean ; and by the same act the Southern Pacific was authorized to connect with the Atlantic and Pacific road at or near the boundary line of the State of California, and to build a railroad thence to San Francisco. Construing together the language of the two authorizations given to the different companies by the same act, the obvious intent and purpose was that the Southern Pacific should build from the point of junction to San Francisco. The Atlantic and Pacific should do no such thing, but should build across westerly by the most eligible route to the Pacific.

Assuming, however, that the Atlantic and Pacific was, by the act of 1866, authorized to build from the Colorado River to the Pacific Ocean over the lands in controversy (instead of by the more natural route through Cajon Pass since adopted in the interest of the Atchison Company, or the more southerly route to San Diego), it had done nothing towards building there, and indicated no purpose to build there till a year after the time when the Southern Pacific, on the 3d of April, 1871, filed its map of general route, designating its line under the Texas Pacific act from Tehachapa Pass, by way of Los Angeles, to Yuma, on the Colorado River, the point at which it was intended that the Texas Pacific

should cross that river. In fact, up to that time the Atlantic and Pacific had only built from 50 to 75 miles in the far distant State of Missouri, and even that was sold out under foreclosure to another company in 1876.

The line so designated by the Southern Pacific Company passed through the lands now in controversy, and that company afterwards proceeded in good faith to construct its railroad substantially on the general route so designated; and, as the work proceeded, successive sections were duly examined by commissioners appointed by the President and their reports accepted by him.

The company entered into possession of the lands (so far as there was any actual possession of the lands), mortgaged and sold them, and, as rapidly as the circumlocution of the Interior Department would admit, received patents therefor.

Under the act of 1866, the Southern Pacific had also designated the general route of its road from the junction point with the Atlantic and Pacific on the Colorado River to San Francisco, all with the due approval of the Government; and, although controversy arose in the Interior Department as to whether the line designated by the Southern Pacific was authorized by the state law, that matter was definitely settled by the action of Congress by the joint resolution of June 28, 1870, authorizing it expressly to construct its railroad on the route indicated by its map of general route.

The Atlantic and Pacific gave no sign of any purpose of building in California at all for three years and two months after the passage of the act of 1866, by which the two companies had been authorized to build on their respective routes from the Colorado River westward. Then, finding that the Southern Pacific had not only filed its map of general route from the boundary line to San Francisco, but was engaged in the actual and rapid construction of its road upon the line so designated, it began its dog-in-the-manger policy, which, from that time, it uniformly pursued in respect to the Southern Pacific by filing the map of 1869, designating its general route from the point of crossing on the Colorado River, not by the most practicable and eligible route to the Pacific Ocean, but

straight upon the track of the Southern Pacific to San Francisco. The plat so filed showed the same line as that shown upon the map of general route of the Southern Pacific, on which the latter company had for two years been building. That is to say, a line through the Tehachapa Pass running east of Tulare Lake, and then across to the northward of the lake, and running through the coast range of mountains to San Francisco.

This map was duly certified by the president of the company as designating the line of the Atlantic and Pacific, and upon it the company claimed the land grant along the line accordingly.

Secretary Cox, with whom the map was filed, rejected it, declaring that he could not recognize the claim of the Atlantic and Pacific Railroad Company to the reservation of lands upon the route in question, because the act already cited, upon which the company relied, did not, as he construed it, give them a route, or make them a grant of lands, from the Colorado River to San Francisco at all.

So matters stood for two years and a half more, the Southern Pacific vigorously prosecuting the work of building; the Atlantic and Pacific neither doing anything in the way of building, nor manifesting any intention of building, westward from the Colorado River in either direction, either to San Francisco or by the most practicable route to the Pacific.

(*d*) And now we come to the facts in respect to the maps of 1872, which do involve the lands in controversy, and the court will perceive that it was but another step in the same dog-in-the-manger policy of the Atlantic and Pacific.

By this time it was pretty clear that the Atlantic and Pacific would never build in California, but it hoped to defeat the Southern Pacific, which was building on the line designated for it by the act of 1871. It now for the first time designated a route, which was far remote and wholly distinct from its route of 1869.

Starting from the Needles, the point of junction, at the crossing of the Colorado River, it ran westerly to San Buena-

ventura on the coast, and thence by a route west of the coast range of mountains to San Francisco.

We claim in this suit that this route of 1872 was an unauthorized route, and that it was never adopted as a definite location of the Atlantic and Pacific so as to vest in the company title to any specific lands.

Assuming that the point that it was an unauthorized route *in toto*, and in all its parts, because it proceeded from the junction point to San Francisco (the route which had been expressly reserved for the Southern Pacific), has been settled adversely to our claim by the previous decision of the court in 146 U. S., we come to the proofs which demonstrate that the line shown upon the 1872 maps was never adopted as the definite location of the Atlantic and Pacific.

The maps running from the western boundary of Missouri to the eastern boundary of California' are all maps which, so far as the maps themselves are concerned, are of the character of maps of definite location; but the first or most easterly of these maps is, the only one which was tendered by the company as a map of definite location. The map from the Missouri state line to the mouth of Kingfisher Creek was tendered and received as a map of definite location; but, after this map was so tendered and filed, the subject whether the maps should be tendered as maps merely designating the line of the road or as maps of definite location obviously received careful consideration from the company and its counsel, and it was determined that they should thereafter be tendered merely as maps of designation of line, and this was done. The obvious purpose of this method of characterizing the maps was to secure withdrawal without committing itself to definite location, and thus leave open the opportunity for a subsequent change of route as between the company and the Government.

Coming to the map on which the present controversy mainly turns, it appears that it was not presented by the company to the Interior Department at all as a map of definite location by which the company intended to be forever

bound and from which it could not change without legislative consent, but merely as a map of designation of route.

We submit, therefore, as to the characterization of the map by the company in presenting it to the Secretary, that it was presented, not as a map of definite location, but purposely and in pursuance of a settled policy as a map of general route and nothing else.

This mode of designation obviously left it open to the company afterwards to claim the right to diverge from the route designated, and carry a divergence of the land grant with it.

Again, the character of the map itself must be looked to as an important element in determining whether, by its filing, it could secure the attachment of the grant to the lands, and vest the title in the company by relation as of the date of the act, and, therefore, the actual facts as proved in respect to this particular map are of the utmost importance for the consideration of the court.

This map is characterized by the company itself in transmitting it to the Department as a map designating the line or route of the railroad over the lands in question.

It partakes upon its face in no sense or manner of the character of a map of definite location. It neither shows the topography of the country nor the relation of the proposed railroad to any of the features of topography, nor to the natural objects along the line of route.

It is upon its face merely a map of general route, showing a general route somewhere nearly on the course of which a road might be thereafter definitely located and constructed, and it served none of the purposes of a map of definite location, for no man could follow it with map in hand and discover where the road would be built; and the line itself, indicated by the route applied to the earth's surface, shows a line running recklessly over hills and mountain tops, regardless of topography, and one not possible for any engineers or responsible officers of railroad companies to have attempted to adopt as a line of definite location.

Compared with the maps of definite location previously

presented by the company, it appears at once to be a wholly different thing.

No resolution of the company, no certificate of its engineer, could convert such a map from what it is into a map of definite location, and, as Mr. Hillyer's letter shows, it was actually tendered by the company to the Government, not as a map of definite location, but as a map of general route. By a clerical error, misled, perhaps, by the certificate of the engineer appended to this map, as this court was misled on the former hearing, the Secretary, in acknowledging the receipt of it (or the Secretary's clerk in drafting the letter for the Secretary to sign acknowledging the receipt of it), by such clerical error referred to it as a map of definite location. This clerical error, as has clearly been shown, was corrected in the Secretary's office, probably upon the suggestion of the attorney of the company, made after his receipt of the erroneous letter; but, as a similar letter referring to it as a map of definite location was sent by him to the Commissioner of the Land Office, that officer, perhaps, proceeded, before the clerical error was corrected in the letter to him upon the subject, to communicate it to his subordinate officials as a map of definite location.

It was impossible that the company or its engineers, or its attorneys, could have intended to commit the company irretrievably to the particular location of its line or road indicated on the map.

As between the Secretary of the Interior and the company they were unquestionably regarded and treated as maps of general route, and not of definite location, and the subsequent correspondence between the company and the Secretary of the Interior proceeded upon the same view.

The character or quality of the maps as tendered by the company and received by the Secretary as maps of general routes are unequivocally shown by the letter of Hillyer of March 8, 1872, tendering them, and the letter of the Secretary of the 9th of March acknowledging its receipt in the form in which that letter was finally framed in the Department, agreeing with the letter of Hillyer tendering them. In the

former case in this court the map was assumed to be a map of definite location from the false certificate thereon, and from the uncorrected copy of the Secretary's letter of March 9, which was in evidence, and the references in the subordinate branches of the Land Office to the map as being a map of definite location, which was due to the failure to completely correct the error in all the copies of the letter referred to.

But since the decision in the former case a great mass of additional evidence in respect to Map No. 31 has been taken, which demonstrates it to have been in fact, as it was presented and received, and as it appears upon its face to be, not a map of definite location at all, but at best only a map of general route and even in that character can hardly be treated as filed in good faith; for if, as this court in the *Northern Pacific case,* 119 U. S. 55, insisted they ought to do, the officers of the Land Department had "exercised supervision of the matter so as to require good faith on the part of the company in designating the general route, and not to accept an arbitrary and capricious selection of the line, irrespective of the character of the country through which the road is to be constructed," this Map No. 31 would necessarily have been rejected; for, if not fraudulent, it is certainly nothing more than an arbitrary and capricious selection of a line irrespective of the character of the country over which the road was to be constructed.

The War Department itself has issued an authentic topographical map which includes a considerable portion of California, covered by the lines shown on Map 31, and, as the record shows, the line shown upon this Atlantic and Pacific Map 31 has been laid down in red upon the Government topographical map, especially in the vicinity of the Soledad Cañon, with the result of demonstrating beyond all doubt, or possibility of doubt, that the route shown on Map 31 does not follow the valley at all, but zigzags across it into hills and mountains where no railroad could possibly be built.

It affords a mathematical demonstration that this route never could have been laid down or designed, or tendered or received, as anything but a map of general route.

But further than this, before the existence of this Govern-

ment topographical map was known by the defendants, the chief engineer of the Southern Pacific Railroad Company took Map No. 31, and followed it on the ground in the vicinity of the Soledad Cañon, and ran his levels to show the vertical position of the points on the line in reference to the sea level. The result of this scientific examination showed that to build a railroad on the line would be impossible for any practical purpose, and that no railroad engineer could have made such a survey for it.

It further appears by the same evidence that the few towns, villages or places purporting to be named on this Atlantic and Pacific map are out of their proper positions — both in latitude and longitude — and not slightly out, but miles and miles out, and all attempts to adapt or shift the map, so as to bring one place into proper position, threw all other places all the more out of position.

It neither followed elevations nor depressions, nor rivers, nor plains, but jumped at random from hill top to mountain top and across valleys.

It necessitated grades wholly impossible in engineering, and in some instances from one quarter to fully one half a mile to the mile, or ten times as steep a grade as is known in use for the ordinary steam locomotive.

The court upon an examination of these proofs cannot but conclude that no competent engineer or honest company could have laid out or adopted this line as a line of definite location.

III. The point upon which the Circuit Court of Appeals based its judgment in favor of the Government is wholly untenable and inapplicable. It is as follows: " Assuming, however, that a survey of a line on the ground is required and that a fraudulent deception was practised upon the Government by the representation that a survey had been made, this is ground upon which the Department might properly reconsider its acceptance and approval of the maps filed; but until such reconsideration the status of the lands is fixed by what was done. The approved maps operated to identify these lands as within the grant to the Atlantic and Pacific

Company without reference to the good faith of the company in preparing them.

" The fact of definite location is settled by the maps, and it is the fact, not the means by which it was procured, that decides a question."

On the contrary, we submit with confidence that we have already demonstrated that the fact of definite location was not settled by the maps, and that inasmuch as the subsequent grant to the Southern Pacific embraced the same lands, and the lands in question could, as this court has held, only be excepted or cut out from that grant by a definite location on the part of the Atlantic and Pacific which alone could attach its grant to the lands, nevertheless, until such definite location was actually and honestly made in good faith, there was no such exception from the grant to the Southern Pacific; and, as no such definite location ever was made by the Atlantic and Pacific, there never was any such exception from the grant to the Southern Pacific.

This view of the Circuit Court of Appeals proceeds upon the assumptions (which are absolutely incorrect) that the Atlantic and Pacific maps were on their face, and that they were accepted by the Interior Department as, maps of definite location, and utterly fails to appreciate the point of our contention.

The court below likens the position of the Southern Pacific in this case to that of an infringer seeking collaterally to avoid a patent by proving that it was procured by fraud from the Government, and relies upon the well-known authorities which prohibit all such attempts upon the ground that fraud, if it existed in such a case, could only be taken advantage of by the Government.

But the very gist of our case, under the former decision of this court in 146 U. S., is that, if the Atlantic and Pacific did not in fact secure these lands by a definite location embracing them, they came to us under our grant, so that, for the very reasons stated in the patent cases referred to, we are here entitled to take advantage of the failure of the Atlantic and Pacific to establish its definite location, and would even have

been so entitled if we had not made out a case of fraud in procuring a map which on its face was not a map of definite location to be accepted as such.

The point so strenuously contended for below by the learned counsel for the Government, but which was not accepted by either of the courts below, that, even though no map of definite location was filed and no route adopted or definitely fixed by the Atlantic and Pacific Railroad Company, any proceedings in the department which assumed that there had been such a map filed are final and conclusive to defeat our rights, has no foundation in law or justice or sense, and there is no authority to support such a proposition as applied to the present case.

*Mr. Joseph H. Call* and *Mr. Assistant Attorney General Dickinson* for appellees.

MR. JUSTICE HARLAN delivered the opinion of the court.

This suit was brought to obtain a decree quieting the title of the United States to a large body of lands in California, acquired under the treaty of Guadalupe Hidalgo.

These lands, it is stated by counsel, aggregate about 700,000 acres, 61,939 acres of which have heretofore been patented to the Southern Pacific Railroad Company, and for 72,000 acres of which that company has made application for patents. They are thus described in the bill filed by the United States: All the sections of land designated by odd numbers in townships 3 and 4 north, ranges 5, 6 and 7 west; township 1 north, ranges 16, 17 and 18 west; township 6 and the south three fourths of township 7 north, ranges 11, 12, 13, 14, 15, 16, 17, 18 and 19 west; all sections designated by odd numbers as shown by the public surveys, embraced within the townships from number 2 north to number 5 north, both numbers included, and ranges from number 8 west to number 18 west, both numbers included, except sections 23 and 35, in township 4 north, range 15 west, and except sections 1, 11 and 13, in township 3 north, range 15 west; also the unsurveyed lands within said area which will be designated as odd-num-

bered sections when the public surveys according to the laws of the United States shall have been extended over such townships — all of the aforesaid lands being surveyed by San Bernardino base and meridian.

The Government suggests that the greater portion of these lands have been set apart under authority of the act of Congress of March 3, 1891, c. 561, § 24, 26 Stat. 1095, 1103, and by the proclamation of the President of the United States of December 20, 1892, 27 Stat. 1049, as a public reservation.

The principal contention of the United States is that the lands in dispute are in the same category in every respect with those in controversy in *United States* v. *Southern Pacific Railroad,* 146 U. S. 570, and *United States* v. *Colton Marble and Lime Co.* and *United States* v. *Southern Pacific Railroad,* 146 U. S. 615 ; and that, so far as the question of title is concerned, the judgments in those cases have conclusively determined, as between the United States and the Southern Pacific Railroad Company and its privies, the essential facts upon which the Government rests its present claim.

Stated in another form, the United States insists that in the former cases the controlling matter in issue was, whether certain maps filed by the Atlantic and Pacific Railroad Company in 1872, and which were accepted by the Land Department, as sufficiently designating that company's line of road under the act of Congress of July 27, 1866, c. 278, 14 Stat. 292, were valid maps of *definite location ;* the United States contending in those cases that they were, and the Southern Pacific Railroad Company contending that they were not, maps of that character; that that issue was determined in favor of the United States; and that as the lands now in dispute are within the limits of the line of road so designated, it is not open to the Southern Pacific Railroad Company, in this proceeding, to question the former determination that such maps sufficiently identified the lands granted to the Atlantic and Pacific Railroad Company by the act of 1866, and were therefore valid maps of definite location.

This position of the Government makes it necessary to ascertain what was in issue and what was determined in the

former cases. Did the former adjudication have the scope attributed to it by the United States? If it did, the decision of the present case will not be difficult.

It is necessary to a clear understanding of the question just stated, that we should first look at the provisions of the several acts of Congress relating to the Atlantic and Pacific and Southern Pacific Railroad Companies, which were referred to and construed in the former cases.

The Atlantic and Pacific Railroad Company was incorporated by the act of Congress approved July 27, 1866, c. 278, 14 Stat. 292, with authority to construct and maintain a line of railroad and telegraph from a point at or near Springfield, Missouri, to the western boundary line of that State, thence by the most eligible railroad route, to be determined by the company, to the Canadian River, thence to Albuquerque on the River Del Norte, thence by way of Agua Frio or other suitable pass to the headwaters of the Colorado Chiquito, thence along the thirty-fifth parallel of latitude, as near as might be found most suitable for a railroad route, to the Colorado River at such point as might be selected by the company for crossing, and "thence by the most practicable and eligible route to the Pacific." § 1. In the aid of the construction of that line Congress granted every odd-numbered section of public land (not mineral) to the amount of twenty alternate sections per mile on each side of such line as the company might adopt through any Territory of the United States, and ten alternate sections per mile on each side of the line through any State, to which the United States had full title, and not reserved, sold, granted or otherwise appropriated, and free from preëmption or other claims or rights, "*at the time* the line of said road *is designated by a plat thereof* filed in the office of the Commissioner of the General Land Office." § 3.

Section 4 made provision for patents to be issued to the company for lands opposite to and coterminous with each section of twenty-five miles of road, completed in a good, substantial and workmanlike manner.

It was also provided that the President of the United States should cause the lands to be surveyed for forty miles in width

on both sides of the entire line after the general route was fixed, and as fast as the construction of the railroad required; that the grants, rights and privileges specified in the act of Congress were given and accepted subject to the conditions that the company would commence work within two years from the approval of the act, complete not less than fifty miles per year after the second year; construct, equip, furnish and complete its main line by July 4, 1878; and if the company made any breach of the conditions imposed, and allowed the same to continue for upwards of one year, then, at any time thereafter, the United States could do any and all acts and things needful and necessary to insure a speedy completion of the road. §§ 6, 8, 9.

By the eighteenth section of the act the Southern Pacific Railroad Company, a California corporation, was authorized to connect with the Atlantic and Pacific Railroad at such point, near the boundary line of the State, as it deemed most suitable for a railroad line to San Francisco; and to have a uniform gauge and rate of freight or fare with that road; and in consideration thereof, to aid in its construction, "shall have similar grants of land, subject to all the conditions and limitations herein provided, and shall be required to construct its road on the like regulations, as to time and manner, with the Atlantic and Pacific Railroad herein provided for."

The twentieth section provided, that the better to accomplish the object of the act, "namely, to promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure to the Government at all times, but particularly in time of war, the use and benefits of the same for postal, military and other purposes, Congress may, at any time, having due regard to the rights of said Atlantic and Pacific Railroad Company, add to, alter, amend or repeal this act."

The legislature of California by an act approved April 4, 1870, authorized the Southern Pacific Railroad Company to change the line of its road so as to reach the eastern boundary of the State by such route as the company should determine to be the most practicable. And by joint resolution passed

June 28, 1870, Congress declared that that company might construct its road and telegraph line, as near as might be, on the route indicated by the map filed by that company in the Department of the Interior on the 3d day of January, 1867, and " upon the construction of each section of said road, in the manner and within the time provided by law, and notice thereof being given by the company to the Secretary of the Interior, he shall direct an examination of each such section by commissioners to be appointed by the President, as provided in the act making a grant of land to said company, approved July 27, 1866, and upon the report of the commissioners to the Secretary of the Interior that such section of said railroad and telegraph line has been constructed as required by law, it shall be the duty of the said Secretary of the Interior to cause patents to be issued to said company for the sections of land coterminous to each constructed section reported on as aforesaid, to the extent and amount granted to said company by the said act of July 27, 1866, expressly saving and reserving all the rights of actual settlers, together with the other conditions and restrictions provided for in the third section of said act."   16 Stat. 382.

By an act approved March 3, 1871, c. 122, Congress incorporated the Texas Pacific Railroad Company and made to it a grant of public lands.   And by the 23d section of that act it was provided :  " That for the purpose of connecting the Texas Pacific Railroad with the city of San Francisco, the Southern Pacific Railroad Company of California is hereby authorized (subject to the laws of California) to construct a line of railroad from a point at or near Tehachapa Pass, by way of Los Angeles, to the Texas Pacific Railroad at or near the Colorado River, with the same rights, grants and privileges, and subject to the same limitations, restrictions and conditions as were granted to said Southern Pacific Railroad Company of California by the act of July twenty-seven, eighteen hundred and sixty-six: *Provided, however*, That this section shall in no way affect or impair the rights, present or prospective, of the Atlantic and Pacific Railroad Company or any other railroad company."   16 Stat. 573, 579.

The Southern Pacific Railroad Company constructed the road thus contemplated, and claims that the lands here in dispute passed to it under the above act of 1871.

The Atlantic and Pacific Railroad Company built part of its road east of Colorado River, but did not construct any line west of that river or in California.

In consequence of such failure, Congress, by the act of July 6, 1886, c. 637, 24 Stat. 123, provided "that all the lands, excepting the right of way and the right, power and authority given to said corporation to take from the public lands adjacent to the line of said road material of earth, stone, timber and so forth, for the construction thereof, including all necessary grounds for station buildings, workshops, depots, machine shops, switches, side tracks, turn-tables and water stations, heretofore granted to the Atlantic and Pacific Railroad Company by an act of Congress entitled, 'An act granting lands to aid in the construction of railroad and telegraph lines from the States of Missouri and Arkansas to the Pacific coast,' approved July 27, 1866, and subsequent acts and joint resolutions of Congress, which are adjacent to and coterminous with the uncompleted portions of the main line of said road, embraced within both the granted and the indemnity limits, as contemplated to be constructed under and by the provisions of the said act of July 27, 1866, and acts and joint resolutions subsequent thereto and relating to the construction of said road and telegraph, be, and the same are hereby, declared *forfeited* and *restored to the public domain.*"

In execution of that act the United States, in 1889, commenced suits in the Circuit Court of the United States for the Southern District of California for the purpose of quieting its title to various tracts of land, aggregating about 5342 acres, and claimed by the Southern Pacific Railroad Company and by other corporations and individuals asserting title under that company. In one of those suits, the Southern Pacific Railroad Company, and D. O. Mills and Garrett L. Lansing, trustees under a mortgage executed by that company on the 1st day of April, 1875, and Joseph Youngblood were made

defendants; in the other, the same company and trustees, together with the City Brick Company, Thomas Goss, Edward Simmons and A. A. Hubbard, were defendants.

These are the cases reported in 146 U. S. 570, 615.

The issues presented by the Government in the former suits are fully shown by an amended bill filed therein November 22, 1889. After referring to the organization of the Southern Pacific Railroad Company, and to the act of Congress of July 27, 1866, it proceeds: "Your orator alleges that by and pursuant to said act of Congress, the Atlantic and Pacific Railroad Company was created and duly organized, and on November 23, 1866, within the time and in the manner provided in said act, accepted said grant, and did *designate the line of its route* from Springfield, Missouri, to the Pacific by maps and plates thereof, which it filed in the office of the Commissioner of the General Land Office in manner following, to wit: On or about March 9, 1872, said company filed in the office of the Commissioner of the General Land Office maps *designating the line of its route*, and showing the general features of the country and vicinity, as follows: First — From San Francisco to San Miguel Mission, in California. Second —Map of its route from San Miguel Mission via Santa Barbara and San Buenaventura, to a point in township 2 south, range 17 west, San Bernardino base and meridian, in California. Third — Map of its route from said point last mentioned to a point in township 7 north, range 7 east, San Bernardino base and meridian, in California. Fourth — Map of its route from said point last named to the Colorado River. And thereafter, on or about March, 1872, said company filed in said office as aforesaid its several other maps, designating its route from said point last named to Springfield in the State of Missouri, making altogether a continuous line designating its entire route, and showing the general features of the country from said town of Springfield, Missouri, by way of the points named in said act of Congress of July 27, 1866, to the Pacific at San Buenaventura, and from there to San Francisco, and in the manner provided in said act, and such designation was accepted by the United States.

Your orator alleges that *said several parts of its map, filed as aforesaid, made and constituted the entire route or line of said Atlantic and Pacific Railroad Company, fully designating the whole thereof."*

It was further averred that " on March 9, 1872, and on April 22, 1872, the Secretary of the Interior and the Commissioner of the General Land Office, respectively, ordered all the odd sections of land within thirty miles on each side of said designated route of said Atlantic and Pacific Railroad Company reserved from sale and withdrawn "; that said Atlantic and Pacific Railroad Company did construct and complete a portion of its road west of Springfield, Missouri, in the time and manner required by said act, but did not at any time construct or complete any railroad west of the Colorado River; and that by the act of Congress approved July 6, 1886, " all the lands and rights to lands theretofore granted and conferred upon said Atlantic and Pacific Railroad Company were forfeited, resumed and restored to entry for non-completion of that portion of said railroad to have been constructed in California."

After alleging that the Southern Pacific Railroad Company was not the company of that name organized under certain articles of amalgamation and consolidation, dated October 11, 1870, and amended April 11, 1871, but was the now existing company of that name, and after setting out the 23d section of the act of Congress of March 3, 1871, c. 122, incorporating the Texas and Pacific Railroad Company, 16 Stat. 573, and granting lands to the Southern Pacific Railroad Company for the line therein described, the amended bill in the former suits proceeded : " Said Southern Pacific Railroad Company, the corporation which existed on April 3, 1871, as heretofore shown, pretended to accept said grant on April 3, 1871, and did on that day designate the line of its road by a plat thereof, which it filed in the office of the Commissioner of the General Land Office, and thereupon the Secretary of the Interior ordered all the public lands in odd sections within thirty miles of such route, to which no right or claim had attached, to be withdrawn from market and reserved.   And your orator

alleges that the Southern Pacific Railroad Company, which was organized and created on August 12, 1873, by the pretended articles of amalgamation and consolidation of said several railroad companies as heretofore set forth, did construct and complete a railroad from Tehachapa Pass, by way of Los Angeles to the Colorado River, in the manner and within the time prescribed in said act of Congress, *in* which the Southern Pacific Railroad Company therein named was authorized and empowered to do. And thereafter the commissioners appointed under said act for that purpose did unlawfully make and file their alleged acceptance of the whole of said railroad by sections. And there was not, and is not now, any railroad or part thereof constructed or completed under said act or between said points otherwise than as aforesaid."

It was also alleged that "on the south side of said route of the Atlantic and Pacific Railroad Company within 30 miles of said route, but also within 20 miles of the pretended designated route of the Southern Pacific Railroad Company, there was not on July 27, 1866, nor on March 12, 1872, nor on April 3, 1871, and is not now, enough public land in the odd sections to equal in amount ten alternate sections per mile of the line of road of said Atlantic and Pacific Railroad Company, within such limits, for that prior to said date of July 27, 1866, the Mexican Government and the United States had sold, granted, reserved and otherwise disposed of so great a quantity of land in those limits;" also, that "all of the said lands before described are situated on the south side of the said designated route of the Atlantic and Pacific Railroad Company more than 20 miles but less than 30 miles therefrom, but are less than 20 miles from the said pretended designated route of said Southern Pacific Railroad Company."

The amended bill concludes by alleging that the defendants and either of them have no title or interest in or to the lands described, "for that said pretended patents under which defendants solely claim title were issued inadvertently, without authority, and were at their inception, and still are, each void and inoperative to pass title, and that said lands were never granted to said Southern Pacific Railroad Company,

defendant herein, but are still owned by the plaintiff"; and that the Secretary of the Interior, on the 16th day of August, 1887, on behalf of the Government, and in accordance with law, demanded of said company the relinquishment of its claim to all of the lands described in such patents, and a return of the patents, all of which that company refused to do.

The relief asked was a decree cancelling the patents issued to the Southern Pacific Railroad Company, quieting the title of the Government to the lands described therein, and enjoining that company from asserting or claiming any right or title thereto adversely to the United States.

The answer of the Southern Pacific Railroad Company, filed in the former suits December 30, 1889, shows its understanding as to what were the issues tendered by the Government. From that answer these extracts are made:

"The defendant admits that by and under said last mentioned act of Congress, [July 27, 1866,] the Atlantic and Pacific Railroad Company was created and organized, and did duly accept the provisions of the said law within the time and in the manner provided in said act, but it *denies* that said Atlantic and Pacific Railroad Company *did designate the line of its route from Springfield, in the State of Missouri, to the Pacific coast, as required by said act.*

"This defendant denies that on the 9th of March, 1872, or at or about any such time, the Atlantic and Pacific Railroad Company filed in the office of the Commissioner of the General Land Office maps designating the line of its route, or otherwise in accordance with the law, and denies that on or about the 9th of March, 1872, said Atlantic and Pacific Railroad Company filed four maps in the office of the Commissioner of the General Land Office, as stated in said bill. Said company filed two maps and claimed that they were filed for the purpose of locating parts or fragments of a line for its road in the State of California, but the defendant *denies that said maps constituted a valid location of said road in California.* Certified copies of said maps are annexed to the answer heretofore filed in this suit by this defendant and marked 'Exhibit A, Nos. 1 and 2,' which, with the indorse-

ments thereon, are now herein referred to and made part of this answer; and this defendant says that said railroad was not located or attempted to be located on or about March 9, 1872, or at any such time, in California, either in whole or in part, otherwise than as aforesaid by said maps. This defendant denies that the Atlantic and Pacific Railroad Company *by or through the filing of said maps, acquired the right to any lands of the United States lying opposite to the lines or route marked on said maps,* and denies that said company acquired the right to select any public lands along said routes or lines as 'other lands' in lieu of sections within twenty miles that had been granted, sold, 'reserved, occupied by homestead settlers, or preëmpted or otherwise disposed of' by the United States. These maps were sent to the General Land Office by the Secretary of the Interior with a letter dated March 9, 1872, of which a certified copy is annexed to said answer heretofore filed, marked 'Exhibit B.'

" This defendant says that the lands mentioned in the amended bill herein lie opposite to the line of route marked on the said map, designated in said letter as No. 2 of a portion of the proposed road of the Atlantic and Pacific Railroad Company, that is, a piece of road within the State of California, 'from a point on the western boundary line of Los Angeles County, California, to a point in township seven north, range seven east, of San Bernardino meridian in said State.' Neither when filed in March, 1872, nor at any such time, did it appear that said map represented any part of a line that was, or was intended to be conjoined to any other part located before that time for the Atlantic and Pacific Railroad.

" Further answering, this defendant says that the Atlantic and Pacific Railroad Company afterwards, viz., on the 13th day of August, 1872, filed in the Department of the Interior two other maps which it claimed were intended to designate the line of other fragments or portions of its railroad in California. Certified copies of said maps and of the letter of the Secretary of the Interior of April 16, 1874, in respect thereto, are annexed to the answer filed heretofore in this suit by

this defendant, marked 'Exhibit C, Nos. 1 and 2,' and *are now herein referred to and made part of this answer.* And this defendant *denies that said maps constituted a valid location of the parts or fractions of road therein described,* and *denies that the four maps hereinbefore mentioned of four several parts of the road constituted a valid location of the said Atlantic and Pacific Railroad in California.* And it denies that the said Atlantic and Pacific Railroad was ever in any otherwise lawfully located in the State of California. . .. . And the defendant says that *there is nothing in or upon said maps to identify the same as the line of road mentioned in the said act of Congress."*

After referring to the eighteenth section of the act of July 27, 1866, and alleging that the construction of a railroad from the Colorado River to San Francisco was "expressly relegated and appropriated to this defendant," and that the Atlantic and Pacific Railroad Company was never authorized to construct any such line of railroad, or to acquire any lands by reason of or in respect of the construction or proposed construction of any such line, the answer of the Southern Pacific Railroad Company denied that "on or about March, 1872, the Atlantic and Pacific Company filed in the office of the Commissioner of the General Land Office maps designating its route from the Colorado River to Springfield, in the State of Missouri," or that "said maps made altogether the line of railroad from Springfield, in the State of Missouri, to the Pacific coast, which was provided for and required by said act of Congress of July 27, 1866, to be constructed and completed by the said Atlantic and Pacific Railroad Company," or "that the several parts of its map filed made and constituted the whole of its line as provided for in said act of Congress"; that the parts of its map, "when taken together, showed a line terminating at San Francisco, which was not the terminus provided for by said act of Congress." The answer also denied that on March 9, 1872, and April 22, 1872, or at any such times, the Secretary of the Interior and the Commissioner of the General Land Office ordered all the odd sections of land within thirty miles on each side of the desig-

nated route of the said Atlantic and Pacific Railroad Company reserved from sale and withdrawn; that about April 22, 1872, the Commissioner of the General Land Office ordered lands withdrawn for thirty miles on each side of the parts of lines of route attempted to be located March 9, 1872, by the two maps hereinbefore mentioned as filed March 9, 1872, his orders being addressed to the register and receiver of the United States land office at San Bernardino, Los Angeles and Visalia, and were substantially as shown by the certified copy of the Commissioner's letter of said date to the officers at Los Angeles; but the defendant denied that the orders of April 22, 1872, had any effect whatever upon its rights and grants, and were intended only to take effect upon public lands not reserved, sold, granted or otherwise appropriated at the time of filing said maps, March 9, 1872.

The defendant averred that "the lands involved in this suit had previously, on the 3d April, 1871, by the filing of the map of definite location of the defendant's railroad, been duly reserved from sale by and under the said 23d section of the act of Congress of March 3, 1871, and the 6th section of the act of Congress of July 27, 1866, which said sections are quoted in the bill of complaint herein, and avers also that said lands had been duly withdrawn from market and appropriated for the use of this defendant by the order of the Commissioner of the General Land Office to the register and receiver of the U. S. land office at Los Angeles, issued April 21, 1871, a copy of which is hereto annexed, marked 'R,' and made a part of this answer."

Admitting that the Atlantic and Pacific Railroad Company did construct and complete a portion of its road west of Springfield, Missouri, in the time and manner required by said act, but averring that that company did not at any time construct or complete any railroad west of the Colorado River, the defendant averred that "on the 3d April, 1871, it designated the line of its said railroad, as described in said section 23, by a map thereof, filed in the office of the Commissioner of the General Land Office, and thereupon the said Commissioner ordered all the public lands in odd sections

within thirty miles of such route to be withdrawn from market. Certified copy of the map filed by this defendant in the office of the Commissioner of the General Land Office is annexed to the answer heretofore filed by this defendant, marked 'Exhibit D,' and the same is now referred to and made part of this answer"; that "it is the same railroad company that constructed the railroad provided for in the 23d section of said act of Congress of March 3, 1871, and that it fully constructed and completed its road according to said act, and the construction thereof has been accepted and approved by the President of the United States, construction of the last mile of said road having been accepted by President Hayes on the 23d of January, 1878."

The Southern Pacific Railroad Company admitted in its answer that the line which the Atlantic and Pacific Company claimed to have located in California "*crosses the line of the Southern Pacific Railroad located under the act of March 3, 1871,*" but alleged "that under and by virtue of said act of March 3, 1871, and the map of location filed on the 3d day of April, 1871, the lands described in said patent were reserved for and appropriated to this defendant, whose title thereto has become perfect and complete by the construction of its road as prescribed in said act," and that "the said Atlantic and Pacific Railroad Company's pretended line was not located until subsequent to the year 1871; that when sought or pretended to be located, it was found to be on a wholly unauthorized route, not prescribed or permitted under any act of Congress in relation to or affecting said Atlantic and Pacific Railroad Company."

The answer of the Southern Pacific Railroad Company, in the former cases, also contained these paragraphs:

"This defendant admits that on the south side of the pretended location of the Atlantic and Pacific road, and within 30 miles thereof, but also within 20 miles of the location of the Southern Pacific Railroad, there was not on April 3, 1871, and is not now, enough public lands in the odd sections to equal ten alternate sections per mile on each side of the pretended location of the line of the said Atlantic and Pacific

Railroad Company within such limits, and this defendant admits that the above described tracts of land are situated more than 20 miles and less than 30 miles from the line of the pretended location of the Atlantic and Pacific Railroad, and less than 20 miles from the said located line of the Southern Pacific Railroad.

"This defendant avers that said tracts of land have been granted, by the 23d section of the act of March 3, 1871, to it, the Southern Pacific Railroad Company. . . .

"This defendant admits that, under date of March 29, 1876, April 4, 1879, and December 27, 1883, the patents were issued to this defendant for the lands hereinabove described, but denies that such patents were issued inadvertently or without authority. On the contrary, this defendant avers that said patents were issued with due deliberation and in strict conformity with the law, and that the signatures of the President of the United States and the Recorder of the General Land Office thereto were affixed fairly and properly and under the authority of law. This defendant here refers to the Exhibit 1, Nos. 1 and 2, annexed to its answer heretofore filed, and makes the same part of this answer.

"When the grant of lands was made to this defendant, March 3, 1871, and its grant was located, April 3, 1871, all the lands involved in this case were public lands of the United States."

To this answer a general replication was filed.

The pleadings in the former suits show that the Government based its claim to relief upon certain grounds that were distinctly controverted by the Southern Pacific Railroad Company. Those grounds were :

That the grant by Congress of public lands to the Atlantic and Pacific Railroad Company was before the grant to the Southern Pacific Railroad Company ;

That when the Atlantic and Pacific Railroad Company designated its line by a plat thereof filed in the office of the Commissioner of the General Land Office, as required by Congress, it acquired an inchoate title to the lands granted,

that is, a right to earn them and to obtain a complete title by construction of its road;

That the Atlantic and Pacific Railroad Company, by certain maps and plats filed in the office of the Commissioner of the General Land Office in 1872 and fully identified both in the bill and answer — which maps were accepted by the Interior Department as adequate and valid — sufficiently designated, as required by the act of 1866, an entire line from San Francisco via San Miguel Mission, Santa Barbara, San Buenaventura and the Colorado River to Springfield, Missouri, so as to become entitled, as of the date of the grant of July 27, 1866, to earn the lands appertaining to the line so designated;

That the lands then in controversy appertained to the line of road, and were within the exterior lines of the route, so designated, were among the lands granted to the Atlantic and Pacific Railroad Company, and in consequence of such designation were withdrawn by the Secretary of the Interior from sale or preëmption for the benefit of that company; and,

That the Atlantic and Pacific Railroad Company having failed to meet the conditions of the grant by constructing its road in California, the lands to which it had acquired an inchoate title by means of the accepted map designating its line, were " restored to the public domain," under the above act of July 6, 1886, c. 637, 24 Stat. 123, and were not left, upon such statutory forfeiture, to be earned by the Southern Pacific Railroad Company under the junior grant.

The Southern Pacific Railroad Company controverted the material allegations of the Government's bill and amended bill, and made defence upon these among other grounds:

That the only designation of a line or route ever made by the Atlantic and Pacific Railroad Company was one of an entire line from Springfield to San Francisco, and that it had no authority to establish, designate or locate any such extended line;

That the maps of 1872 filed by the Atlantic and Pacific Railroad Company, which were referred to in the bill, and also made *parts of the company's answer,* were *not sufficient*

*to identify any specific lands west of the Colorado River ; were not, therefore, maps of definite location ;* and that that company never made any sufficient location or designation of a line in California, so that it could claim the lands in dispute under the grant made by the act of 1866 ;

That the lands in question were covered by the location made by the Southern Pacific Railroad Company under the act of Congress granting lands to it, and were part of those withdrawn from sale and in its favor by the Secretary of the Interior; and,

That, in any view, the right of the Southern Pacific Railroad Company to those lands attached and became complete upon the forfeiture of the lands and rights granted to the Atlantic and Pacific Railroad Company, such forfeiture — it was claimed — not affecting the rights previously acquired by the Southern Pacific Railroad Company under the accepted maps of the definite location of its line, and under the withdrawal from sale of the lands appertaining to that line.

In the former suits it was conceded that *if* the maps filed by the Atlantic and Pacific Railroad Company in 1872 were valid maps of *definite location*, sufficiently identifying the lands granted to it, then the lands involved in those suits were within the overlapping limits of the two grants.

The learned counsel for the railroad company in those cases contended that, in order to show a conflict between the claims of the two companies to the particular lands then in controversy, the United States must show that the Atlantic and Pacific Railroad Company designated its route under the act of 1866, and that there was no proof of that fact " except that the Atlantic and Pacific Company from time to time filed certain fragmentary maps pretending to designate routes, and which, if connected, would not constitute a route such as the act of 1866 authorized it to select." This general point, counsel argued, resolved itself into three subsidiary questions, namely : " 1. Whether the Atlantic and Pacific Railroad Company *ever designated its route :* 2. Whether such a designation, if made, *operated*, from the mere circumstance that the grant to that company was prior in time to that made to the

Southern Pacific Company, *to exclude the lands in the over-lapping limits at the place of crossing from the latter grant:*
3. Whether, if such designation was made, the proviso in the 23d section of the above act of March 3, 1871, protecting the rights, 'present and prospective,' of the Atlantic and Pacific Company, was designed for any other purpose than to save to it any lands which it might eventually earn by a full performance of its undertaking."

Manifestly the fundamental question in the former cases was whether the Atlantic and Pacific Railroad Company ever filed any such maps as the act of 1866 contemplated when declaring that the odd-numbered sections granted should be those on the line of the road to which the United States had full title, not reserved, sold, granted or otherwise appropriated, and free from preëmption or other claims or rights, "at the time the line of said road is designated by a plat thereof, filed in the office of the Commissioner of the General Land Office."

In those cases, the Circuit Court denied the relief asked, and dismissed the bills filed by the United States. 39 Fed. Rep. 132 ; 40 Fed. Rep. 611; 45 Fed. Rep. 596; 46 Fed. Rep. 683. But this court reversed the judgments so rendered, holding —

That the grants to the Atlantic and Pacific and the Southern Pacific Railroad Companies were *in præsenti*, that is to say, the route not being at the time determined, the grant was in the nature of a float, no title attaching to any specific sections until they were capable of identification ;

That when the granted lands were once identified by approved maps of definite location, the grants severally took effect by relation as of the dates of the respective acts of Congress — the grant to the Atlantic and Pacific Railroad Company being prior in time to that made to the Southern Pacific Railroad Company ;

That the Atlantic and Pacific Railroad Company did file maps of definite location in 1872, which were "received and approved by the Land Department *as maps of definite location*"; that *then* "the specific tracts were designated, and

*to them* the title of the Atlantic and Pacific attached *as of July* 27, 1866 "; that " in fact the line of definite location of the Atlantic and Pacific was established, and maps thereof filed and approved, before any action in that respect was taken by the Southern Pacific Company "; and that " there was never a time, therefore, at which the grant of the Southern Pacific could be said to have attached to these lands, and the plausible argument based thereon, made by counsel for the Southern Pacific Company, falls to the ground ";

That the map filed by the Southern Pacific Railroad Company April 3, 1871, could not have been a map of definite location, but was " only of the general route, and there was *then* no designation of lands *to which the Southern Pacific Company's title could attach*";

That it was immaterial whether the map of definite location of the Southern Pacific road was filed and approved before or after April 11, 1872, " for, when filed, the grant could take effect by relation only as of March 3, 1871 [the date of the grant to it], and *at that time, and for nearly five years theretofore*, the title to these lands had been in the Atlantic and Pacific "; nor was it material that the act of 1871 " in terms purports to bestow the same rights, grants and privileges as were granted to the Southern Pacific Railroad Company by the act of 1866," for that merely defined " the extent of the grant and the character of the rights and privileges " given, and did " not operate to make the latter grant take effect by relation as of the date of the prior grant, and thus subject the grants to the two companies to the rule controlling contemporaneous grants as established by *St. Paul and Sioux City Railroad* v. *Winona and St. Peter Railroad*, 112 U. S. 720, and *Sioux City and St. Paul Railroad* v. *Chicago, Milwaukee &c. Railway*, 117 U. S. 406 "; that " even if Congress had in terms expressed an intent to that effect in a subsequent act, it was not competent by such legislation to divest the rights already vested in the Atlantic and Pacific Company "; that the case, stating it in the best way for the railroad company, was one " of two companies with conflicting grants, each of whose line of definite location has been

approved by the Land Department"; and that "unquestionably, the grant older in date takes the land";

That whatever right or title was acquired by the Southern Pacific Railroad Company, by its map filed April 3, 1871, was "*absolutely displaced when the Atlantic and Pacific Company's map was filed*"; that Congress intended "no scramble between companies for the grasping of titles by priority of location, but that it is to be regarded as though title passes as of the date of the act, and to the company having priority of grant, and, therefore, that in the eye of the law it is now as though there never was a period of time during which any title to these lands was in the Southern Pacific"; so that, "whatever may have been the dates of the filing by the respective companies, the case stands as though the lands granted to the Atlantic and Pacific had been identified in 1866 and title had *then* passed, and *there never was a title of any kind vested in the Southern Pacific Company*"; and,

That upon the forfeiture by Congress of the rights granted to the Atlantic and Pacific Railroad Company, the lands to which its grant had attached upon the filing and acceptance of its map of definite location in 1872 *did not inure to the benefit of the Southern Pacific Railroad Company;* that "if the act of forfeiture had not been passed by Congress, the Atlantic and Pacific could yet construct the road, and that constructing it, its title to these lands would become perfect"; that "no power but Congress could interfere with this right of the Atlantic and Pacific"; that "Congress, by the act of forfeiture of July 6, 1886, determined what should become of the lands forfeited"; that "it enacted that they be restored to the public domain"; that "the forfeiture was not for the benefit of the Southern Pacific, it was not to enlarge its grant as it stood prior to the act of forfeiture," but was for the benefit of the United States, as shown by the act of Congress declaring that the lands be restored to the public domain; consequently, that by the act of forfeiture, "the title of the Atlantic and Pacific was retaken by the General Government, and retaken for its own benefit and not that of the Southern Pacific Company"; and that the lands belonged to the

United States, and the Southern Pacific Railroad Company had "no title of any kind" to them. *United States* v. *Southern Pacific Railroad,* 146 U. S. 570, 607.

Touching the point made in the former cases, that the maps filed by the Atlantic and Pacific Railroad Company designating a line from the Colorado River to San Francisco were inoperative by reason of the want of authority to construct a road to the latter city, the court said: "But it is urged by counsel for defendant that no map of definite location of line between the Colorado River and the Pacific Ocean was ever filed by the Atlantic and Pacific or approved by the Secretary of the Interior. This contention is based upon these facts: The Atlantic and Pacific Company claimed that, under its charter, it was authorized to build a road from the Colorado River to the Pacific Ocean, and thence along the coast up to San Francisco; and it filed maps thereof in four sections. San Buenaventura was the point where the westward line first touched the Pacific Ocean. One of these maps was of that portion of the line extending from the western boundary of Los Angeles County, a point east of San Buenaventura, and through that place to San Miguel Mission, in the direction of San Francisco. In other words, San Buenaventura was not the terminus of any line of definite location from the Colorado River westward, whether shown by one or more maps, but only an intermediate point on one sectional map. When the four maps were filed, and in 1872, the Land Department, holding that the Atlantic and Pacific Company was authorized to build not only from the Colorado River directly to the Pacific Ocean, but also thence north to San Francisco, approved them *as establishing the line of definite location.* Subsequently, and while Mr. Justice Lamar was Secretary of the Interior, the matter was reëxamined, and it was properly held that under the act of 1866 the grant to the Atlantic and Pacific was exhausted when its line reached the Pacific Ocean. San Buenaventura was, therefore, held to be the western terminus, and the location of the line approved to that point. The fact that its line was located, and maps filed thereof in sections, is immaterial. *St. Paul & Pacific Rail-*

road v. *Northern Pacific Railroad*, 139 U. S. 1.  Indeed, all the transcontinental roads, it is believed, filed their maps of route in sections.  So the question is, whether the filing a map of definite location from the Colorado River through San Buenaventura to San Francisco, under a claim of right to construct a road the entire distance, is good as a map of definite location from the Colorado River to San Buenaventura, the latter point being the limit of the grant.  *We think, unquestionably, it is.*  Though a party claims more than he is legally entitled to, his claim ought not to be rejected for that to which he has a right.  The purpose of filing a map of definite location is to enable the Land Department to designate the lands passing under the grant; and when a map of such a line is filed, full information is given, and, so far as that line may legally extend, the law perfects the title.  It surely cannot be that a company must determine at its peril the extent to which its grant may go, or that a mistake in such determination works a forfeiture of all its right to lands."  146 U. S. 570, 596.

The closing paragraph in the opinion in the former cases is in these words: " Our conclusions, therefore, are, that a valid and sufficient map of definite location of its route from the Colorado River to the Pacific Ocean was filed by the Atlantic and Pacific Company and approved by the Secretary of the Interior; that by such act the title to these lands passed, under the grant of 1866, to the Atlantic and Pacific Railroad Company, and remained held by it subject to a condition subsequent until the act of forfeiture of 1886; that by that act of forfeiture the title of the Atlantic and Pacific was retaken by the General Government and retaken for its benefit, and not that of the Southern Pacific Company, and *that the latter company has no title of any kind to these lands.*"  146 U. S. 607.

In the cases of *United States* v. *Colton Marble and Lime Company* and *United States* v. *Southern Pacific Railroad Company*, 146 U. S. 615, it was adjudged that the proviso in the act of March 3, 1871, c. 122, 16 Stat. 573 (giving lands in aid of the construction of the Southern Pacific Railroad), that the grant should " in no way affect or impair the rights, present

or prospective, of the Atlantic and Pacific Railroad Company," operated to except the indemnity lands of the Atlantic and Pacific Company from the grant to the Southern Pacific Company.

The former cases were decided in this court on the 12th day of December, 1892.

A petition for rehearing was presented to the several members of the court, but a rehearing was not granted. In that petition the Southern Pacific Railroad Company insisted that this court had erred in various particulars, among them the following:

In not giving due legal effect to the forfeiture act of July 6, 1886, its contention — as on the original hearing — being that the legal operation and effect of that act were to avoid the grant to the Atlantic and Pacific Railroad Company as of the date of the act of 1866, and to restore to the United States, *as of that date*, the title of all the lands embraced in the forfeiture, leaving nothing in the way of the full enjoyment by the Southern Pacific Railroad Company of the grant made to it; consequently, that all proceedings taken by the Atlantic and Pacific Railroad Company, under the act of 1866, were avoided and defeated as absolutely and effectually as if the grant had never been made and no proceedings taken in execution of it; and,

In respect to the "designation of line under the Atlantic and Pacific Railroad maps and the effect and operation thereof."

The present suit was brought by the United States against the Southern Pacific Railroad Company and D. O. Mills and G. L. Lansing as trustees in a mortgage executed by that company on the 1st day of April, 1875 (the same trustees and mortgage referred to in the former cases), as well as against certain individuals and corporations, to quiet the title of the United States to the lands involved in this suit. It was pending at the time the former cases were decided in this court. The lands now in controversy are situated opposite to and are coterminous with the first, second and fourth sections of the Southern Pacific Railroad as constructed between 1873 and

1877, inclusive, and within the primary and indemnity limits of the grant to the Southern Pacific Railroad Company made by the 23d section of the Texas and Pacific act of March 3, 1871; the 61,939.62 acres patented to that company being opposite to the first and fourth sections of its road. It may be said that the lands here in dispute belong to one or the other of the following classes: Lands within the common granted limits of both the Atlantic and Pacific grant of 1866 and the Southern Pacific grant of 1871; lands within the granted limits of the Southern Pacific grant and the indemnity limits of the Atlantic and Pacific grant; lands within the Southern Pacific indemnity limits and the Atlantic and Pacific granted limits; lands within the common indemnity limits of both grants. Of those in dispute, 219,012.93 acres have not been surveyed by the United States.

But all the lands now in dispute are within the limits of the grant to the Atlantic and Pacific Railroad Company, *if* the maps filed by that company in 1872, and which were approved by the Land Department, are to be regarded as maps of definite location. This is substantially admitted to be a correct statement of the controlling question before the court; for the defendants, in their very able argument, state that the lands involved in this suit "are within the limits which would have appertained to the grant to the Atlantic and Pacific upon the 1872 route, *if* that had been an authorized route, and *if* a *definite location* had been duly made thereon so as to attach the grant to specific lands."

The contingencies here suggested have been fully met by this court; for it was distinctly adjudged, in the former cases, as between the Government and the Southern Pacific Railroad Company, 146 U. S. 570, 596, that the maps filed in 1872 sufficiently identified the lands granted to the Atlantic and Pacific Railroad Company on the contemplated line between the Colorado River and San Buenaventura on the Pacific coast, although, for want of authority in that company to construct a railroad to San Francisco, they did not secure to the company any lands north of San Buenaventura; that is, those maps were directly adjudged to be maps adequately

fixing or locating the line of the road under the act of 1866. The records of those cases having been introduced in the present suit, there is no room for doubt — if those records are competent evidence — as to what was in issue and what was adjudged in the former cases. The maps which in this case are relied upon by the United States as maps of definite location, and which the Southern Pacific Railroad Company denies to be of that character, *are the identical maps which the Government relied on in the former cases,* and the same which that company referred to *and made part of its answer in the former litigation,* and which were adjudged by this court, in conformity with the contention of the Government, to be valid maps of definite location, the acceptance of which made it impossible for the Southern Pacific Railroad Company to acquire any interest in any lands granted to the Atlantic and Pacific Railroad Company that were forfeited to the United States by the act of 1886.

It is said, however, that, under the pleadings and evidence in this collateral proceeding, it is open to the Southern Pacific Railroad Company to renew the contest as to the sufficiency of the maps of 1872 filed by the Atlantic and Pacific Railroad Company and to show that they were not maps of definite location.

Is this position consistent with the settled rule of law as to the conclusiveness, between parties and their privies, of the final determination by a court of competent jurisdiction of matters put in issue by the pleadings?

The importance of this question, independently of the magnitude of the interests to be affected by our decision, and of the earnest contention of learned counsel, justifies a reference to some of the adjudged cases, showing the grounds upon which this salutary rule rests.

The general principle announced in numerous cases is that a right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; and even if the second suit is for a different cause of action, the right, question or fact

once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified. This general rule is demanded by the very object for which civil courts have been established, which is to secure the peace and repose of society by the settlement of matters capable of judicial determination. Its enforcement is essential to the maintenance of social order; for, the aid of judicial tribunals would not be invoked for the vindication of rights of person and property, if, as between parties and their privies, conclusiveness did not attend the judgments of such tribunals in respect of all matters properly put in issue and actually determined by them.

Among the cases in this court that illustrate the general rule are *Hopkins* v. *Lee*, 6 Wheat. 109, 113; *Smith* v. *Kernochen*, 7 How. 198, 216; *Thompson* v. *Roberts*, 24 How. 233, 240; *Washington, Alexandria & Georgetown Steam Packet Co.* v. *Sickles*, 24 How. 333, 340, 341, 343; *Russell* v. *Place*, 94 U. S. 606, 608; *Cromwell* v. *Sac County*, 94 U. S. 351; *Campbell* v. *Rankin*, 99 U. S. 261; *Lumber Co.* v. *Buchtel*, 101 U. S. 638; *Bissell* v. *Spring Valley Township*, 124 U. S. 225, 230; and *Johnson Co.* v. *Wharton*, 152 U. S. 252.

In *Hopkins* v. *Lee* — which was a suit in equity by the purchaser of land to compel the vendor to remove certain incumbrances upon it — it was held that a fact established therein and made the basis of a decree could not be disputed in a subsequent action of covenant brought by the latter against the former for not conveying certain lands, part of the consideration, the court saying that the rule on that subject had found its way into every system of jurisprudence, not only from its obvious fitness and propriety, but because without it an end could not be put to litigation; in *Smith* v. *Kernochen* — which was ejectment by an assignee of a mortgage to recover possession of the mortgaged premises — that a final decree, in a previous suit, brought by the mortgagee against the mortgagor to foreclose the mortgage, adjudging the mortgage to be invalid for want of authority in the mortgagor to execute it, concluded the question of title, the court observing

that the case came within the general rule that the judgment of a court of concurrent jurisdiction directly upon the point is as a plea a bar, or as evidence conclusive between the same parties or their privies upon the same matters when brought directly in question in another court; in *Thompson* v. *Roberts*, that the judgment of a court of law, or a decree of a court of equity, directly upon the same point, and between the same parties, is good as a plea in bar, and conclusive when given in evidence in a subsequent suit; in *Washington, Alexandria & Georgetown Steam Packet Co.* v. *Sickles*, that to the end that rights might be secured and the repose of society preserved, and that limits might be imposed upon the faculties for litigation, the presumption had been adopted that the thing adjudged by a court of competent jurisdiction, under definite conditions, shall be received in evidence " as irrefragable truth," such a presumption being a guarantee of the future efficiency and binding operation of the judgment; in *Cromwell* v. *Sac County*, that a judgment upon the merits constitutes an absolute bar to a subsequent suit upon the same cause of action in respect to every matter offered and received in evidence, or which might have been offered to sustain or defeat the claim in controversy, while if the second action is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted upon the determination of which the finding or verdict was rendered, the injury in such case being " as to the point or question actually litigated and determined in the original action, not what might have been litigated and determined "; in *Russell* v. *Place*, that " a judgment of a court of competent jurisdiction, upon a question directly involved in one suit, is conclusive as to that question in another suit between the same parties"; in *Campbell* v. *Rankin*, that in an action to recover damages for trespass upon a mining claim, the record of a former suit between the same parties, involving the same question of interfering mining claims, was admissible as evidence, the court observing that " whenever the same question has been in issue and tried and judgment rendered, it is conclusive of the issue so decided in any subse-

quent suit between the same parties"; in *Lumber Co.* v. *Buchtel*, that in a suit for the amount of the first instalment due on a contract for the purchase of timber lands — the defence being that the defendant had been induced to make the contract by false and fraudulent representations — a judgment based upon a finding that no such representations were made, was conclusive in respect of that matter in a subsequent action brought on the contract to recover a different instalment; in *Bissell* v. *Spring Valley Township*, that an adjudication, in an action on coupons of municipal bonds, sustaining the defence that the municipality never executed the bonds, and that the bonds were not its legal obligations, was conclusive in a subsequent action brought by the same party on different coupons of the same bonds; and in *Johnson Co.* v. *Wharton*, that in an action to recover stipulated royalties, for a named period, for guard rails constructed according to the specifications of a certain patent, in which judgment was given for the plaintiff, the defendant in a second suit brought to recover like royalties for a later period could not make the same defence, although, by reason of the small amount in dispute, he was precluded from having the judgment in the first suit reviewed upon writ of error, this court stating that it was a general rule, having its foundation in a wise public policy, that the final judgment of a court, at least one of superior jurisdiction, competent under the law of its creation to deal with the parties and the subject-matter, and having acquired jurisdiction of the parties, concludes those parties and their privies in respect of every matter put in issue by the pleadings and determined by such court. See also *Lessee of Parrish* v. *Ferris*, 2 Black, 606, 608; *Packet Co.* v. *Sickles*, 5 Wall. 580, 592; *Dowell* v. *Applegate*, 152 U. S. 327, 342.

The latest expressions of opinion by this court on this question are in *Last Chance Mining Co.* v. *Tyler Mining Co.*, 157 U. S. 683, 691, and *New Orleans* v. *Citizens' Bank*, 167 U. S. 371, 396. In the first of these cases it was held that a judgment by default in favor of the Last Chance Mining Company against the Tyler Mining Company for a parcel of land embraced within the boundaries of certain mining claims,

alleged to have been legally located and to belong to the former company, precluded the latter company from contending in a subsequent action for part of a mineral vein not embraced within the former suit, but within the mining claims involved in the first suit, that the mining claims in question had not been legally located — the court observing that "a judgment by default was just as conclusive an adjudication between the parties of what is essential to support the judgment as one rendered after answer and contest," the essence of estoppel by judgment being that "there has been a judicial determination of a fact, and the question always is, has there been such determination, and not, upon what evidence or by what means was it reached?"

In *New Orleans* v. *Citizens' Bank*, it was held that the final and unreversed judgment of a court in Louisiana of superior jurisdiction upon the issue, duly raised by the pleadings, whether the bank was exempt by contract with the State from taxes assessed against it for particular years, concluded that question, as between the same parties and their representatives, in respect of taxes assessed against it for subsequent years. In that case the court said: "The estoppel resulting from the thing adjudged does not depend upon whether there is the same demand in both cases, but exists, even although there be different demands, when the question upon which the recovery of the second demand depends has under identical circumstances and conditions been previously concluded by a judgment between the parties or their privies."

In view of these adjudications, it would seem that the controlling inquiry is whether, under the pleadings in the former cases, the sufficiency of the Atlantic and Pacific maps of 1872 as maps of definite location, was a matter in issue and determined, as between the United States and the Southern Pacific Railroad Company. That that matter was in issue and was actually decided in the former cases, is too clear to admit of doubt. That it was material is equally clear; for, upon its determination depended the question whether the grant of public lands to the Atlantic and Pacific Railroad Company attached to any specific lands along its line to which the for-

feiture act of 1886 could apply. If those maps were valid maps of definite location, then, according to the settled adjudications of this court, to which reference has often been made, the right of that company to earn the lands appertaining to its line, thus definitely located, attached, by relation, as of the date of the grant to it in 1866; and in this view the Southern Pacific Railroad Company, holding the junior grant, took none of the lands appertaining to that line by reason of the definite location and construction of its line. Thus, also, those lands were in such condition, at the date of the forfeiture act of 1886, that they could be forfeited as lands in which the Atlantic and Pacific Railroad Company then had an interest, and, in accordance with the act of Congress, be fully restored to the public domain for the exclusive benefit of the United States, unaffected by the later grant made to the Southern Pacific Railroad Company.

The only way in which, in the former cases, the court could have avoided a decision as to the character of those maps, was to have held that whether they were maps of definite location or not, the rights of the Southern Pacific Railroad Company attached, upon the declaration of forfeiture, to the lands then in dispute, and that Congress was without power to restore them to the public domain. So far from sustaining that view, the court expressly adjudged that, upon the acceptance of the Atlantic and Pacific maps of 1872, the rights of *that* company, in the lands granted, attached *as of the date of the grant of* 1866, and that it was not possible for the Southern Pacific Railroad Company, by the location of its road, *whether located before or after the acceptance of the maps of* 1872, to acquire any interest whatever in the lands there in dispute that would prevent Congress, upon forfeiting the rights of the Atlantic and Pacific Railroad Company, from restoring such lands to the public domain to be disposed of by the United States as it saw proper.

It is in effect said that the failure of the Government in the former cases to aver, in words, that the maps of 1872 were maps of " definite location," leaves the question of the sufficiency of those maps open in this case relating to different

lands.   It seems to be forgotten that the amended bill was in
exact conformity with the act of 1866, which in the third sec-
tion — the one making the grant — used the words "at the
time the line of said road is *designated* by a plat thereof filed
in the office of the Commissioner of the General Land Office."
The word "designated" in that act meant no more nor less
than the words "definitely located" mean.   When the South-
ern Pacific Railroad Company denied that the Atlantic and
Pacific line had been sufficiently designated, or that there had
been a valid location of it, both litigants, as well as the court,
understood, and properly, that the case presented the question
whether there had been such a definite location of the Atlan-
tic and Pacific line as the act of Congress required.   That
that company so understood the word "designated," as used
in the third section of the act of 1866, is beyond question;
for its answer filed in the former cases on the 30th of Decem-
ber, 1889, in which it claimed the lands then in controversy,
refers to the map filed by it on the 3d April, 1871, as one by
which "it *designated* the line of its said railroad."   And when
it was adjudged that the maps of 1872 indicated a definite
location of the line of the Atlantic and Pacific Railroad, the
settled rules of law forbid that the defeated party should
reopen that question in another suit, relating to other lands
appertaining to the line so designated.   The matter alleged
by the Government, and upon which the recovery proceeded,
was, we repeat, the sufficiency of the maps of 1872 to entitle
the Atlantic and Pacific Railroad Company to earn the lands
there in dispute.

It is also said that the decision in the former cases con-
cluded, at most, only the question of title in respect of the
lands there in controversy.   This cannot be correct when the
lands in both suits have a common source of title, and the title
depends upon the existence or non-existence of the same fact
or facts.   If the accepted maps filed by the Atlantic and
Pacific Railroad Company in 1872 sufficiently located the line
of that company, it could not possibly be that they were valid
maps of definite location as to part of the lands appertaining
to that line, and not maps of that character in respect of

other lands embraced by it. Consequently, the former judgment, while unmodified, determined the character of the maps, as between the United States and the Southern Pacific Railroad Company. If the court had adjudged in the former cases that those maps were neither filed nor accepted as maps of definite location, but were only maps of general route, could it be doubted that the Government would have been estopped from asserting to the contrary in a subsequent suit involving other lands claimed by the Southern Pacific Railroad Company which were covered by the same maps, and appertained to the same line? Must a different principle be applied because the decision was favorable to the Government upon the question whether the maps of 1872 were maps of definite location? Certainly not.

But it is earnestly insisted that a prior judgment cannot operate as an estoppel in a subsequent suit between the same parties, unless it be pleaded when there is an opportunity to do so; that such an opportunity existed in this suit; and that the United States having failed to avail itself of that opportunity, it was open to the court to determine the truth of the matter upon all the evidence now before it.

This contention is based upon the 45th Rule in Equity, providing: "No special replication to any answer shall be filed. But if any matter alleged in the answer shall make it necessary for the plaintiff to amend his bill, he may have leave to amend the same with or without payment of costs, as the court, or a judge thereof, may in his discretion direct." Under this rule, it is said, the United States had an opportunity to amend its bill, and in that mode to have met the allegations of the amended answer of 1893; but having failed to ask leave to amend, it lost the benefit of the former judgment.

The part of the amended answer of 1893 to which counsel refer as making an issue or issues not made in the former cases, and which, it is contended, must have been met by an amended bill if the Government expected to rely upon the prior judgment, is as follows:

"And the said respondents deny that said Atlantic and Pacific Railroad Company did locate on the ground or desig-

nate upon a plat or map the whole of said line of railroad, under or in accordance with said act, from Springfield, Missouri, by way of the points or places named in said act, or otherwise, to the Pacific Ocean, and deny that it ever lawfully located or adopted or designated any part of said line in the State of California; and deny that on or about the — day of ——, 1866, or at any other time, said company did file any such plat in the office of the Commissioner of the General Land Office, and deny that at that, or at any such time, any such designation or location of said line of railroad was approved by the Secretary of the Interior; and deny that the odd sections of public lands on each side of said road for thirty miles were withdrawn from market or reserved; and deny that the lands in suit herein, or any of them, fell within the twenty-mile limits of any such line, or were ever lawfully withdrawn from market, or reserved for, or for the benefit of, the said Atlantic and Pacific Railroad Company; and deny that the Atlantic and Pacific Railroad Company ever designated a line of railroad between the Colorado River and the Pacific Ocean by a map thereof filed in the office of the Commissioner of the General Land Office, or made or filed a map of definite location of a route from the Colorado River to the Pacific Ocean, whether by the most practical and eligible route or otherwise howsoever. The said respondents aver that the said Atlantic and Pacific Railroad Company never made any actual or definite location of its railroad in California, nor constructed any part of a railroad in said State, under or according to the act of Congress approved July 27, 1866, or any amendments, modifications or supplements thereto or otherwise howsoever. The pretended location of a route by said Atlantic and Pacific Railroad Company in California never was or became an actual or definite location, or anything else than an attempted or pretended designation of a general route for a railroad from San Francisco to the Needles, and such pretended location or designation of route was a colorable and fraudulent location or designation of an unauthorized and impracticable line. The Secretary of the Interior never undertook to accept such pretended loca-

tion or designation as anything else than a designation of a general route, and no right to or interest in any public lands was, or could be, acquired by said railroad company by reason of any such attempted location or designation, or any act of acceptance thereof."

Undoubtedly, there are cases in which a party may lose the benefit of a prior judgment, in respect of matters determined by it, when, having an opportunity to plead such judgment, he fails to do so.   But that principle has no application in the present case.   Under Equity Rule 45, a general replication to the amended answer of the defendant company sufficed, unless that amended answer contained such matter as made it "necessary" that the Government should amend the bill.   But when a former recovery is to be relied on by the plaintiff it can only be necessary to amend the bill when the rules of pleading imperatively require that to be done in order to obtain the benefit of such recovery.   No amendment of the bill was necessary in this case for the reason that the judgment in the prior suit — the present suit being on a different cause of action — could not be pleaded as an absolute bar arising upon the face of the record, but could be used *as evidence* to support the contention that the maps of 1872 sufficiently identified the lands granted by the act of 1866.   The contrary is again asserted by the Southern Pacific Railroad Company in this suit.   But that precise issue we have seen was made in the former suit, and was determined for the United States.   And to establish that fact, the United States introduced the former record as evidence in its behalf. To say that the Government lost the benefit of its former judgment, covering this issue or question, because it did not amend its bill and plead the judgment as an estoppel, is to say that it was required to set out in its pleading what was merely evidence to support its title to the lands in controversy.   The 45th Equity Rule is not to be so interpreted.   It means, at most, that a general replication is always sufficient to put in issue every material allegation of an answer or amended answer, unless the rules of pleading imperatively require an amendment of the bill.   Besides, Rule 45 must be construed in connection

with the Equity Rule 19, declaring that the plaintiff, at his discretion, may omit from the bill " what is commonly called the charging part of the bill, setting forth the matters or excuses which the defendant is supposed to intend to set up by way of defence to the bill." If it was competent for the Government, in this case, to have referred, in its bill, to the former suit, and, in advance, by appropriate allegations, to have met the objections which it supposed the defendant would urge to the former judgment as fixing the character of the maps of 1872, it was not bound to pursue that course nor to amend its bill and set out what was only evidence of its title to the particular lands in controversy.

But there is another reason why the United States was not required to amend its bill. Before the amended answer of 1893 was filed, the Government, by its pleadings, had distinctly alleged that the maps of 1872 sufficiently designated the line of the Atlantic and Pacific Railroad, and identified the lands granted to it, while the defendant's pleadings with equal distinctness averred that they were not valid maps of definite location. Such was the condition of the record when this court decided the former case on the 12th day of December, 1892. That decision, as we are informed by the railroad company, instructed it " as to where the real strain of the controversy came," and having failed " to appreciate the inferences which the court might draw from facts or evidence," leave was obtained in the Circuit Court to file, and it did file in this case, the amended answer of 1893, bringing, it is claimed, into view such new issues and such additional facts as deprived the Government of the right, unless it amended the bill and formally pleaded such judgment as an estoppel, to rely upon the judgment in the prior cases as conclusive of the matters determined by it. That which is claimed to be new in the amended answer was not such matter as even prior to Equity Rule 45 would have required a special replication or an amended bill in order to avoid its effect. The amended answer was, at most, only a more extended statement of the grounds of defence previously set forth. The manifest purpose of it was to relieve the strain of the prior

decision, and, under the guise of presenting new issues of a substantial character, to enable the railroad company, by introducing additional evidence on its behalf, to retry, in this collateral proceeding, the question as to the sufficiency of the maps of 1872. The pleadings in the prior cases distinctly averred an adequate designation of the line of the Atlantic and Pacific Railroad and the identification of the lands appertaining to that line. The averment in the amended answer of 1893, that the location by the Atlantic and Pacific Railroad Company of its route in California "never was or became an actual or definite location," but was only "an attempted or pretended designation of a general route for a railroad from San Francisco to the Needles," and that such designation of its route was "a colorable and fraudulent location or designation of an unauthorized and impracticable line," was not at all necessary, because the defendant company, under its original answer, if not estopped by the former judgment, could have introduced any evidence tending to show that there had been no valid definite location of the line of the Atlantic and Pacific Railroad, and that the maps of 1872 were filed and accepted only for the purpose of indicating a general route. So that if the Government was entitled, under the pleadings as they were when the defendant company filed its amended answer of 1893, to introduce in evidence the record and judgment in the former cases, its right in that respect was not lost by its failure to amend its bill and specially set up that record.

That the record and judgment in the former cases were admissible in evidence, without being specially pleaded, we entertain no doubt. And when before the court as admissible evidence, the only inquiry was whether the sufficiency of the maps of 1872 was a matter in issue and determined between the parties to those cases. There are some cases holding that a judgment, without being specially pleaded, is not conclusive upon the issues to which it relates, but is only persuasive evidence, and that the court is at liberty to find according to the truth as shown by all the evidence before it. But according to the weight of authority and upon prin-

ciple, the former judgment, if admissible in evidence at all, is conclusive of the matters put in issue and actually determined by it. Mr. Greenleaf correctly says that " the weight of authority, at least in the United States, is believed to be in favor of the position that where a former recovery is given in evidence, it is equally conclusive, in its effect, as if it were specially pleaded by the way of estoppel." 1 Greenleaf on Ev. § 531. This view is in accord with the decisions of this court above cited. See, also, *Marsh* v. *Pier*, 4 Rawle, 272, 288; *Lawrence* v. *Hunt*, 10 Wend. 80, 83; *Betts* v. *Stair*, 5 Connecticut, 550; *Sawyer* v. *Woodbury*, 7 Gray, 499, 502; *Jennison* v. *West Springfield*, 13 Gray, 544; *Cannon* v. *Brame*, 45 Alabama, 262; *Trayhern* v. *Colburn*, 66 Maryland, 277, 278; *Garton* v. *Botts*, 73 Missouri, 274, 278; *Walker* v. *Chase*, 53 Maine, 258, 260; *Lynch* v. *Swanton*, 53 Maine, 100, 102; *Prather* v. *Owens*, Cheves (Law), 236; *Jones* v. *Weathersbee*, 4 Strob. (Law) 50, 54, 55; *Warwick* v. *Underwood*, 3 Head, 238, 240; *Isaacs* v. *Clark*, 12 Vermont, 692, 694.

In the present case the railroad company has made an elaborate argument in support of the proposition that the necessary legal effect of the forfeiture act of July 6, 1886 was to restore the title of all lands affected by that act to the United States, *as of the date* of the grant of July 27, 1866, and to "avoid" and "defeat," as of that date, the grant to the Atlantic and Pacific Railroad Company with like effect as if it had never existed ; that, upon such forfeiture, the United States became seized of its original estate in the lands as of July 27, 1866, with the same effect as if it had never made any grant to the Atlantic and Pacific Railroad Company ; and that it could only enter upon the lands for forfeiture as of its former estate in them. In this view, it is contended that the rights of the Southern Pacific Railroad Company attached immediately upon the forfeiture, and before the lands so forfeited were restored to the public domain. It is sufficient to say, in reference to this contention, that the question as to the effect of the act of forfeiture upon the rights of the Southern Pacific Railroad Company was fully considered and determined in the former cases. It was held that it was

not the intention of Congress that these lands should pass conditionally to the Southern Pacific Railroad Company, or to give to it any lands previously granted to the other company, and that the first proviso of section three of the act of 1866 imports that "Congress was not only not intending to give to one company that which it had already given to another, but intended that lands previously granted should be definitely excepted from the later grant." The court said: "Again, there can be no question, under the authorities heretofore cited, that, if the act of forfeiture had not been passed by Congress, the Atlantic and Pacific could yet construct its road, and that, constructing it, its title to these lands would become perfect. No power but that of Congress could interfere with this right of the Atlantic and Pacific. No one but the grantor can raise the question of a breach of a condition subsequent. Congress, by the act of forfeiture of July 6, 1886, determined what should become of the lands forfeited. It enacted that they be restored to the public domain. The forfeiture was not for the benefit of the Southern Pacific; it was not to enlarge its grant as it stood prior to the act of forfeiture. It had given to the Southern Pacific all that it had agreed to in its original grant; and now, finding that the Atlantic and Pacific was guilty of a breach of a condition subsequent, it elected to enforce a forfeiture for that breach and a forfeiture for its own benefit."

For the reasons stated, we are of opinion that it must be taken in this case to have been conclusively adjudicated in the former cases as between the United States and the Southern Pacific Railroad Company—

1. That the maps filed by the Atlantic and Pacific Railroad Company in 1872 were sufficient, as maps of definite location, to identify the lands granted to that company by the act of 1866.

2. That upon the acceptance of those maps by the Land Department, the rights of that company in the lands so granted, attached, by relation, as of the date of the act of 1866; and,

3. That in view of the conditions attached to the grant,

and of the reservations of power in Congress contained in the act of 1866, such lands became, upon the passage of the forfeiture act of 1886, the property of the United States, and by force of that act were restored to the public domain, without the Southern Pacific Railroad Company having acquired any interest therein that affected the power of the United States to forfeit and restore them to the public domain.

These grounds being accepted as the basis of our decision, the law in the present case is clearly for the United States; for, as all the lands here in controversy are embraced by the maps of 1872, and, therefore, appertain to the line located by such maps, it must be, for the reasons stated in the former decision, that the United States is entitled, as between it and the Southern Pacific Railroad Company, to the relief given by the decree below.

Even if we were prepared upon a reëxamination of the former cases, or upon the showing made by the present record, to hold that the maps of 1872 were not valid maps of definite location, we could not for that reason, in this proceeding, go behind the former adjudication, and deny to the United States the benefit of the rule making that adjudication, so long as it was unmodified, conclusive, as between the parties to it, of all matters actually determined under the issues in the prior suits.

One other matter deserves attention. The learned counsel for the railroad company in their extended comments upon the evidence in the present record, insist that, under the proof now before the court, it is indisputable that the Atlantic and Pacific Railroad Company did nothing more than file, in the Interior Department, "a map of general or *preliminary* route for the purpose of securing a *preliminary* withdrawal of lands"; that the maps of 1872 were neither filed nor accepted as maps of definite location; and that the proof is of such a peculiar character as to demand an examination of it by the court.

In support of this contention reference was made to duly certified copies of certain letters, appearing in the records of the Interior Department: 1. A letter to Mr. Delano, Secre-

tary of the Interior, from Mr. Hillyer, attorney of the Atlantic and Pacific Railroad Company under date of March 8, 1872, enclosing "the accompanying maps to be filed in the office of the Commissioner of the General Land Office" — the above maps of 1872, four in number — which letter concludes: "The Atlantic and Pacific Railroad Company respectfully request that the lands embraced in the grant to the company under the provisions of the act of July 27, 1866, and, coterminous with the portions of the line or route designated by the plats herewith filed or heretofore filed by said company, may be withdrawn from sale, entry or preëmption and reserved for said railroad company according to the provisions of said act." 2. A letter from Secretary Delano to Mr. Hillyer, under date of March 9, 1872, acknowledging the receipt of the latter's letter, "transmitting four maps of the preliminary location of portions of the Atlantic & Pacific Railroad," and saying that said "maps have to-day been transmitted to the Commissioner of the General Land Office for appropriate action." 3. A letter from the Secretary of the Interior to the Commissioner of the General Land Office, under date of March 9, 1872, saying: "I transmit herewith, for appropriate action, four maps of the preliminary location of portions of the Atlantic & Pacific Railroad," and that said "maps were received yesterday from C. J. Hillyer, Esq., atty. of the Co. — in this city."

From these documents it appears that the attorney of the railroad company described two of the maps as "designating," and the remaining two as "showing," the line or route of the railroad, while the two letters of the Secretary describe them as maps of the "*preliminary* location of portions" of the road. It is conceded that in the letters of the Secretary, *as originally written*, the maps were referred to as maps of *definite location* of portions of the Atlantic and Pacific Railroad. And it was shown that the word "preliminary," inserted in place of "definite," in the two letters of the Secretary, was in the handwriting of a former (now deceased) clerk in the Land and Railroad Division of the Interior Department, who, it is claimed, made the change with the knowledge

or in conformity with the directions of the Secretary; also, that corresponding memoranda, in pencil and in the handwriting of that clerk, appear upon those letters, and upon the jackets containing them.

Upon the part of the United States it is contended that there is no evidence whatever tending to show that the Secretary had any knowledge of or directed the word " definite " to be stricken out and " preliminary " inserted ; on the contrary, that the Department, at all times, subsequently to March 9, 1872, treated the maps in question as maps of definite location. In support of its position the Government refers to the fact that in the letter-press copy, as well as in what is called by counsel the permanent record of letters, in the Department, the letter of the Secretary to the Commissioner of the General Land Office contains the words " definite location," not " preliminary location," and the letter of the Secretary to Mr. Hillyer of March 9, 1872 reads " four maps of the definite location," not " four maps of the preliminary location." The Government also refers to the fact that when the Commissioner of the Land Office received the letter from the Secretary of the Interior the indorsement placed on the back of the map was in these words: " Map of definite location of the Atlantic and Pacific Railroad through the county the Los Angeles, and part of San Bernardino, Cal. Received at the G. L. O. with Secretary's letter of March 9, 1872 "; also to the letter of the Commissioner, dated April 22, 1872, and addressed to the local land officers in California, in which the former said: " Gentlemen: I transmit herewith a diagram showing the definite location of the Atlantic and Pacific Railroad under the act of July 27, 1866, Stat. Vol. 14, p. 292, from a point on the western boundary of Los Angeles Co. to a point in T. 7 N., R. 7 E. of the San Bernardino, in your district, showing also the twenty and thirty-mile limits of the land grant under said act," etc. It also appears that Assistant Attorney General Smith, in an official communication addressed to the Secretary of the Interior, under date of March 16, 1874 — in which he considered the question of the right of the Atlantic and Pacific Railroad Company to locate its

line from the Colorado River, by way of Tehachapa Pass to San Francisco — referred to and treated the maps of 1872 as maps of definite location. And they were so referred to and treated by Secretary Lamar in his opinion of March 23, 1886, holding that that company was not entitled to construct a road from San Buenaventura to San Francisco.  4 D. L. O. 458.

We cannot concur in the view that the evidence upon this branch of this case is of such nature as to compel the court, in the interest of truth and justice, not only to consider it but to pass again upon the issue made in the former suits as to the character of the maps of 1872. Whatever is new in the evidence now before us, touching that matter, is simply cumulative on the one side or the other. The application to consider that evidence is practically an application for a rehearing as to things directly determined in the former suits between the same parties, and which adjudication has never been modified. Such a course of procedure is wholly inadmissible under the settled rule of *res judicata.* Without, therefore, expressing any opinion as to the effect of this new evidence relating to matters once finally adjudged, we hold that the Southern Pacific Railroad Company cannot, in this proceeding, question the validity of those maps as maps of definite location.

One of the objects of this suit was to obtain a decree quieting the title of the United States, not only to the lands claimed by the Southern Pacific Railroad Company, but to those claimed by numerous individual defendants by purchase from or contract with that company. The decree which was passed declares that it is not to "affect any right which the defendants, or any of them, other than the Southern Pacific Railroad Company, now have or may hereafter acquire in, to or respecting any of the lands hereinbefore described, in virtue of the act of Congress entitled 'An act to provide for the adjustment of land grants made by Congress to aid in the construction of railroads and for the forfeiture of unearned lands, and for other purposes,' approved March 3, 1887." Instead of leaving undetermined the matters in dispute between the United States and the defendants other than the

Southern Pacific Railroad Company, the Circuit Court should have determined, by its final decree, what rights those defendants have by virtue of the above act of March 3, 1887, 24 Stat. 556, c. 376, in the lands or any of them now in dispute and claimed by the United States. The effect of the decree is to leave undetermined the question whether the defendants who claim under the Southern Pacific Railroad Company are protected by that or any other act of Congress. The Government was entitled to a decree quieting its title to all the lands described in its pleadings, except those, if any, that are protected, in the hands of claimants, by acts of Congress. *United States* v. *Winona & St. Peter Railroad*, 165 U. S. 463; *Winona & St. Peter Railroad* v. *United States*, 165 U. S. 483. But as the Government has not appealed, the decree cannot be reversed for the error of the Circuit Court in not finally disposing of the issues between the United States and the individual defendants who claim under the Southern Pacific Railroad Company.

*The result is that the decree must be affirmed in all respects as to the Southern Pacific Railroad Company, as well as to the trustees in the mortgage executed by that company, and affirmed also as to the other defendants, subject, however, to the right of the Government to proceed in the Circuit Court to a final decree as to those defendants, and it is so ordered.*