GEORGIA R. & BANKING CO. v. WRIGHT, Comptroller General.

(Circuit Court, N. D. Georgia.   September 29, 1904.)

No. 1,192.

**1. TAXATION—RAILROAD CORPORATION—CONSTRUCTION OF CHARTER.**

In the provision of section 15 of the charter of the Georgia Railroad Company (now the Georgia Railroad & Banking Company), granted by the Legislature of Georgia in 1833 (Laws 1833, p. 264), that "the stock of said company and its branches shall be exempt from taxation for and during the term of seven years, * * * and after that shall be subject to a tax not exceeding one-half per cent. per annum on the net proceeds of their investments," the word "stock" means the capital of the corporation, and not the shares of stock in the hands of the individual owners, and the provision establishes the limit of taxation of the corporation upon its capital stock.

**2. RES JUDICATA—MATTERS CONCLUDED BY JUDGMENT.**

The Supreme Court of Georgia having decided in a suit between the state and the Georgia Railroad & Banking Company that the charter of the company created a contract which precluded the state from imposing a tax upon the company in excess of one-half of 1 per cent. of its net earnings, that question is res judicata between the parties, and the decision concludes the state in any subsequent suit, although it involves taxes levied for a different year or under a different statute.

**3. TAXATION—LIMITATION BY CHARTER OF RAILROAD COMPANY—TAX ON FRANCHISE.**

The provision of the charter of the Georgia Railroad & Banking Company that its stock shall be subject to a tax not exceeding one-half per cent. per annum on its net earnings imposes a limit to all taxation to which the company may be subjected on account of the capital invested in the enterprise contemplated by the charter or its franchise to carry on such enterprise and, in view of the contract created by such charter provision, the state cannot impose a tax on the company's franchise under the franchise tax act of December 17, 1902 (Laws 1902, p. 37).

In Equity.   Suit for injunction.

Jos. B. & Bryan Cumming and King, Spalding & Little, for complainant.

John C. Hart, Atty. Gen., for defendant.

NEWMAN, District Judge.   This is a bill brought by the complainant corporation against the defendant, Wm. A. Wright, Comptroller General of the state of Georgia, seeking an injunction against what the company claims is an illegal effort to tax it, and to have a decree adjudging that it is not liable for a property tax on its railroad, or any tax on its franchise, and that the only tax for which it is liable is a tax to the state of one-half of 1 per cent. on the net earnings of its investments.

The defendant has interposed demurrers and pleas, and the complainant, by an amendment, the plea of res judicata, all of which, however, put in issue and bring before the court clearly certain specific questions as to the liability of the complainant company for taxation by the state of Georgia, which will be hereafter noted.

The Georgia Railroad & Banking Company was incorporated originally under the name of the Georgia Railroad Company, by an act

passed by the Legislature of Georgia, approved December 21, 1833. The provision of the act material here and which is for construction, is a part of the fifteenth section, as follows:

"The stock of said company and its branches shall be exempt from taxation for and during the term of seven years from and after the completion of the said railroads or any one of them, and after that shall be subject to a tax not exceeding one-half per cent. per annum on the net proceeds of their investments." Laws 1833, p. 264.

The state has for 60 years or more allowed the company to return its net earnings and pay a tax thereon of one-half of 1 per cent., without objection, so far as shown here, except (as will be hereafter referred to) the effort to impose a property tax under the act of 1874. The issues presented are: (1) Does the word "stock," as used in this taxing clause in the company's charter, refer to stock in the aggregate in the hands of the company (its capital stock), or does it refer to stock in the hands of the shareholders? (2) Is the decision of the Supreme Court of Georgia rendered in 1874 on the right to tax this corporation res judicata in this case? And (3) is this company subject to a tax on its franchise under the franchise tax act of the Legislature of Georgia of 1902 (Laws 1902, p. 37), in view of the taxing clause in its charter? Other minor questions are raised, but the foregoing are the main and important ones.

The distinguished Attorney General, representing the Comptroller General, contends that the word "stock" in the clause under consideration refers to stock in the hands of the shareholders, as distinguished from the entire capital stock of the company; and he concedes that the case very largely depends upon the soundness of his contention in this respect. He has urged with much force, both in the oral argument and in the brief he has handed in, this view of the proper meaning of the taxing clause of the charter of the complainant company, which has been quoted above.

It may be remarked in the first place, that, so far as this record shows, or so far as the reported cases show, no effort has ever been made on the part of the state or its officers to treat the scheme of taxation provided for in this clause of the Georgia Railroad Company's charter as referring to shareholders. The tax has always beeen imposed upon the net earnings of the company, the state treating the word "stock" therefore necessarily as meaning the capital stock in the hands of the company, and not the separate shares of stock in the hands of the shareholders. This course of procedure by the officials of the state has been justified by the decisions of the Supreme Court of the state. In the case of City Council of Augusta v. Georgia Railroad & Banking Company, 26 Ga. 651, the language used by the court in the opinion clearly indicates that such is its view of the meaning of the word "stock." This is from the opinion:

"We think that this part of the charter means, secondly, that the stock of the company, as stock, as a unit, is alone what is to be subject to the tax," etc.

And this further expression:

"We think, then, that the stock employed in banking is to be considered as included in the expression 'the stock of the company,' and therefore that it also is entitled to the exemption."

132 F.—58

In the opinion of the court in State of Georgia v. Georgia Railroad & Banking Company, 54 Ga. 423, the language "that its tax shall not exceed one-half per cent. on its earnings" is manifestly to the same effect.

These expressions, used by the Supreme Court in the decisions named, show beyond question that the court considered the term "stock" as referring to stock in the aggregate in the hands of the company.

In Ordinary of Bibb County v. Central Railroad & Banking Co., 40 Ga. 646–650, Judge Warner speaks of stock of a corporation in this way:

"What is the 'stock' of said railroad companies? Bouvier defines stock to be 'the capital of corporations; this is usually divided into shares of a definite value, as one hundred dollars, fifty dollars, per share.' 2d Bouvier's Law Dictionary, 531. The stock of these companies then consists of their capital invested in such property as may be necessary and proper for conducting the business for which they were chartered. All the property of these companies that is necessary and proper for the purpose of laying, building, and sustaining their respective railroads constitutes a part of the capital stock of said companies, and is not liable to be taxed in any other manner than is specified in their respective charters."

It is further urged that the use of the pronoun "their" preceding the word "investments" indicates that the reference in the clause is to shareholders who should become interested in this enterprise, and not to the corporation. The opposing contention is that it is used in the same sense as if the pronoun "its" had been used instead of "their." An examination of this act shows the latter contention to be true beyond question. The first section of the act has this language: "The company provided for in this act and herein more especially incorporated and authorized shall and may direct and confine their first efforts," etc. In the third section, these two expressions are used: "The said company shall be at liberty to enlarge their capital," and "books for enlarging their capital," etc. And also in the same section: "So as to make their capital adequate," etc.; and also this: "It shall be lawful for the company from time to time to invest so much of said parts of their capital or of their profits," etc. In section 9 this occurs: "The aforesaid company * * * by their corporate name aforesaid may sue," etc. And in section 10: "The said Georgia Railroad Company shall have power and capacity to purchase and have and hold in fee simple or for years to them and their successors," etc. In other instances the pronouns "their," "they," and "them" are used in referring to the company. The language of the clause itself indicates that the word "their" relates to the company, and not to the stockholders separately. Reference would hardly be made to what the stockholder gets by way of a dividend as the "net" proceeds of his investment. The use of the word "net" indicates that something is being deducted. It could only refer to the company, which deducts its expenses, and has clear, over and above all outlay, a certain amount, which is the net proceeds in its hands on the investment. In addition to this the Supreme Court of the State in State of Georgia v. The Georgia Railroad & Banking Company, supra, clearly treats the word "their" as having this meaning when the tax provided for in this clause is spoken of as a tax "on its earnings," etc. There can be no

reasonable doubt, therefore, considering this entire clause, that it refers to the capital stock of the company, and that it was the intention of these early lawmakers that the company should pay the state, after seven years from the completion of the road, one-half of 1 per cent. on its net earnings. There was nothing remarkable about this provision, when we consider the time and conditions. In 1833 railroad building was in its infancy. No one could tell whether this project would be successful or not. It was experimental. Those who put in their capital might, so far as could be then seen, suffer complete loss. What was more natural than that the Legislature should allow a very moderate scheme of taxation for such an enterprise?

In 1874 an act was passed by the Legislature of Georgia, entitled "An act to amend the tax laws of this state, so far as the same relate to railroad companies, and to define the liability of such companies to taxation, and to repeal so much of the charters of such companies respectively, as may conflict with the provisions of this act." Laws 1874, p. 107. In the body of the act (section 1) it was provided that:

"The presidents of all the railroad companies in this state shall be required to return, on oath, annually, to the Comptroller General, the value of the property of their respective companies, without deducting their indebtedness; each class or species of property to be separately named and valued, so far as the same may be practicable, to be taxed as other property of the people of the state."

Under this act an effort was made to tax the Georgia Railroad & Banking Company. The matter was carried into the courts, and determined in favor of the railroad company by the superior court of Fulton county. The case was taken by the state to the Supreme Court, and by that court the judgment of the court below was affirmed. State of Georgia v. Georgia Railroad & Banking Co., supra. The decision in that case is a comprehensive one. So much of the opinion by Judge McCay as is material here is as follows:

"As the Supreme Court of the United States is a court of appeals from this court, on a question of this character I feel bound to conform myself to its decision, although I feel it to be my duty to what I deem the truth to express my dissent from the conclusions at which it has arrived. On the authority of these decisions we therefore decide that it is competent for the General Assembly to contract in the charter of a corporation that it shall be exempt from taxation, or, as in the charter of the Georgia Railroad Company, that its tax shall not exceed one-half of one per cent. on its earnings, and that, having so contracted, without reservation, it is not competent for a subsequent Legislature to violate the obligation of that contract by assessing a higher tax. Nor has there been any legislation accepted by the company since the adoption of the Code which puts this corporation on a footing with the Central and Southwestern Roads, so as that the terms by which it holds its franchises and exemption is a charter granted since the Code, and therefore capable of being withdrawn."

This decision is pleaded by the complainant here by an amendment to the bill as res judicata, and I think it must be so regarded. It is distinctly held that the tax of the Georgia Railroad & Banking Company shall not exceed "one-half of one per cent. on its earnings"; that this is a contract with the state; and that it is not competent for any subsequent Legislature to violate the obligation of this contract by assessing a higher tax. That is what it attempted here, and the decision named clearly holds that it cannot be done. It is a decision, in my judgment,

of the same question now before the court, and is between the same parties.

In Southern Pacific Railroad v. United States, 168 U. S. 1–48, 18 Sup. Ct. 18, 27, 42 L. Ed. 355, the rule in reference to res judicata is stated as follows:

"The general principle announced in numerous cases is that the right question or fact distinctly put in issue and directly determined by a court of competent jurisdiction as a ground of recovery cannot be disputed in a subsequent suit between the same parties or their privies; and, even if the second suit is for a different cause of action, the right, question, or fact once so determined, must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified. This general rule is demanded by the very object for which civil courts have been established, which is to secure the peace and repose of society by the settlement of matters capable of judicial determination. Its enforcement is essential to the maintenance of social order; for the aid of judicial tribunals would not be invoked for the vindication of rights of persons and property, if, as between parties and their privies, conclusiveness did not attend the judgments of such tribunals in respect of all matters properly put in issue and actually determined by them."

Whatever doubts may have existed as to the question of res judicata applying in a case where liability for taxation had been determined for one year and there was a proceeding for a succeeding year is now set at rest. In New Orleans v. Citizens' Bank, 167 U. S. 396, 17 Sup. Ct. 905, 42 L. Ed. 202, this question is discussed at some length by Mr. Justice White, delivering the opinion of a majo ⁀y of the court. The following extract will show what was there determined:

"The proposition that because a suit for a tax of one year is a different demand from the suit for a tax for another, therefore res judicata cannot apply, whilst admitting in form the principle of the things adjudged, in reality substantially denies and destroys it. The estoppel resulting from the thing adjudged does not depend upon whether there is the same demand in both cases, but exists, even although there be different demands, when the question upon which the recovery of the second demand depends has under identical circumstances and conditions been previously concluded by a judgment between the parties or their privies. This is the elemental rule stated in the text-books, and enforced by many decisions of this court. A brief review of some of the leading cases will make this perfectly clear. In Bank v. Beverley, 1 How. 134–139, 11 L. Ed. 75, it was held that a construction of a will affecting the rights of parties must govern in subsequent controversies between the same parties, without reference to the different nature of the demands. In Tioga R. Co. v. Blossburg, etc., R. Co., 20 Wall. 137, 22 L. Ed. 331, and Lumber Co. v. Buchtel, 101 U. S. 638, 25 L. Ed. 1072, it was held that, when the proper construction of a contract was in controversy, the construction adjudged by the court would bind the parties in all future disputes. In Cromwell v. County of Sac, 94 U. S. 353, 24 L. Ed. 195, after a full statement of the nature of the estoppel resulting from the thing adjudged where the demand was the same in both cases, the court then considered the extent of the estoppel, where the causes of action were distinct, and said (page 353): 'But, where the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted upon the determination of which the finding or verdict was rendered. In all cases, therefore, where it is sought to apply the estoppel of a judgment rendered upon one cause of action to the matters arising in a suit upon a different cause of action, the inquiry must always be as to the point or question actually litigated and determined in the original action, not what might have been thus litigated and determined. Only upon such matters is the judgment conclusive in another action.'

"It is unnecessary to multiply citations of authority, as the subject has been quite recently fully considered and passed upon by this court. In Last Chance Min. Co. v. Tyler Min. Co., 157 U. S. 687, 15 Sup. Ct. 733, 39 L. Ed. 859, where an estoppel resulting from the thing adjudged was enforced, this court said (page 687, 157 U. S., and page 735, 15 Sup. Ct., 39 L. Ed. 859): 'The law in respect to estoppel by judgment is well settled, and the only difficulty lies in the application of the law to the facts. The particular matter in controversy in the adverse suit was the triangular piece of ground, which is not the matter of dispute in this action. The judgment in that case is therefore not conclusive in this as to matters which might have been decided, but only as to matters which were in fact decided. Hopkins v. Lee, 6 Wheat. 109, 5 L. Ed. 218; Smith v. Kernochen, 7 How. 198, 12 L. Ed. 666; Pennington v. Gibson, 16 How. 65, 14 L. Ed. 847; Stockton v. Ford, 18 How. 418, 15 L. Ed. 395; Packet Co. v. Sickles, 24 How. 333, 16 L. Ed. 650; Id., 5 Wall. 580, 18 L. Ed. 550; Parrish v. Ferris, 2 Black, 606, 17 L. Ed. 317; Cromwell v. County of Sac, 94 U. S. 351, 24 L. Ed. 195; Davis v. Brown, 94 U. S. 423, 24 L. Ed. 204; Russell v. Place, 94 U. S. 606, 24 L. Ed. 214; Campbell v. Rankin, 99 U. S. 261, 25 L. Ed. 435; Lumber Co. v. Buchtel, 101 U. S. 638, 25 L. Ed. 1072; Stout v. Lye, 103 U. S. 66, 26 L. Ed. 428; Nesbit v. Independent Dist., 144 U. S. 610, 12 Sup. Ct. 746, 36 L. Ed. 562; Rail Co. v. Wharton, 152 U. S. 252, 14 Sup. Ct. 608, 38 L. Ed. 429.'

"And the law of Louisiana is exactly in accord with the rulings of this court; for, as said by the Supreme Court of Louisiana in Heroman v. Institute, 34 La. Ann. 814: 'No principle of the law is more inflexible than that which fixes the absolute conclusiveness of such a judgment upon the parties and their privies. Whether the reasons upon which it was based were sound or not, and even if no reasons at all were given, the judgment imports absolute verity, and the parties are forever estopped from disputing its correctness. Cooley, Const. Lim. p. 47 et seq., and authorities there cited. "Matters once determined in a court of competent jurisdiction may never again be called in question by parties or privies against objection, though the judgment may have been erroneous, and liable to, and certain of, reversal in a higher court." Bigelow, Estop. (3d Ed.) Outline, pp. lxi., 29, 57, 103. "The estoppel extends to every material allegation or statement which, having been made on one side and denied on the other, was at issue in the cause, and was determined therein." Aurora v. West, 7 Wall. 102, 19 L. Ed. 42; Van Pelt v. McGraw, 4 N. Y. 113; Bryan v. Atchison, 2 La. Ann. 462; Shaffer v. Scuddy, 14 La. Ann. 576; Plicque v. Perret, 19 La. 318; Gilman v. Horseley, 5 Mart. (N. S.) 664; Dufour v. Camfranc, 11 Mart. (La.) 607, 13 Am. Dec. 360; Patterson v. Bonner, 14 La. 233; Martin v. Martin's Heirs, 5 Mart. (N. S.) 170.'

"It follows, then, that the mere fact that the demand in this case is for a tax for one year, and the demands in the adjudged cases were for taxes for other years, does not prevent the operation of the thing adjudged, if, in the prior cases, the question of exemption was necessarily presented and determined upon identically the same facts upon which the right of exemption is now claimed. The argument that, as a matter of public policy, the principle of the thing adjudged should be held not to apply to controversies as to taxation, if there be merit in it, should be addressed to the lawmaking, and not to the judicial, department. But, if the judicial mind could entertain the suggestion, it seems clear that it is without real merit. In its ultimate aspect it asserts that no question concerning government or public authority ought ever to be submitted to judicial investigation. Indeed, the contention is that there is no power in courts of justice to consider any question of taxation or render any judgment in relation thereto. That this is the result of the proposition is manifest from the fact that the very essence of judicial power is that, when a matter is once ascertained and determined, it is forever concluded when it arises again under the same circumstances and conditions between parties or their privies. To admit the judical power on the one hand, and to deny on the other the very substance and essence of such power, is not only contradictory, but destructive of the fundamental conceptions upon which our system of government is based. Upon this theory the cause under consideration should not be entertained, but should be dismissed. Accepting the argument in its full consequence, every judgment rendered by this court from

the foundation of the government, declaring a particular tax or burden unconstitutional, imports no efficacy whatever. Every decree of this court enforcing taxation in order to discharge obligations previously contracted, where the right to the tax was a part of the obligation, is deprived of the sanctity of the thing adjudged; for manifestly, if the estoppel of the thing adjudged does not arise from a judgment preventing taxation, such an estoppel cannot also result from a judgment enforcing taxation."

After still further citation and discussion of authorities, the opinion continues:

"It follows, then, that the theory by which it is sought to take questions of taxation entirely out of the reach of the rule of the thing adjudged is not only without foundation in reason, but is also without support of authority, since the case from this court which is cited to sustain it cannot properly be said to maintain the contention, and the other, from the Supreme Court of Iowa, has been either overruled or qualified."

The foregoing extracts render any further citation of authority unnecessary, and, the decision in 54 Ga., involving, as I have stated, the same question, and being between the same parties as the present case, the judgment there is conclusive here.

But it is said that a decision of the Supreme Court of the state (Goldsmith, Comptroller General, v. Georgia Railroad Company, 62 Ga. 485), made subsequently to that which has just been discussed, modifies the ruling made in 54 Ga., and lays down a rule for taxing the Georgia Railroad & Banking Company, which should be followed here. In this last case the issue was made by an affidavit of illegality to an execution issued by the Comptroller General. The decision of the Supreme Court was that the judgment of the court below should be reversed, and the affidavit of illegality which had been sustained in the superior court dismissed, because, as was held, an affidavit of illegality would not be entertained as a mode of defense to a tax execution issued by the Comptroller General in any case in which a return had not been made by the railroad company as provided by the tax act of 1874. Notwithstanding the direction given the case, the Supreme Court laid down a rule for taxing the Georgia Railroad & Banking Company, which was, in effect, that its property, so far as it had a value over and above the amount of the capital stock authorized and subscribed prior to January 1, 1863, was subject to tax. The only thing decided in the case was that it was improperly brought, and should be dismissed; consequently the expressions of the court as to the proper method of taxing this corporation could not affect the res judicata arising out of the case in 54 Ga. The decision in 62 Ga. was made in 1879, and yet, for 24 years—or until 1903—no effort whatever was made to tax the Georgia Railroad & Banking Company in the method therein stated. The tax returns of the company have been made and the tax collected in the manner provided in the charter, on net earnings, and in the same manner as has been done since the railroad company commenced to pay taxes. If what is stated in the 62 Ga. opinion had been in a case where the issue was made and determined, an entirely different question would be presented here. But where a case is dismissed out of court, any expressions therein cannot be regarded as controlling for the purpose of affecting a former binding adjudication.

It may be that the decision in 54 Ga. should not be regarded as res judicata as to the effort to tax the franchise of this company under the

tax act of 1902, and it may be proper that this should be considered as an original question here. But even as to the right to tax the franchise it is a useful and important authority.

Having thus disposed of these two questions, the remaining one of the three more important questions raised in the case is that of the right of the state, under the franchise tax act, approved December 17, 1902, to impose a tax on the franchise of the Georgia Railroad & Banking Company. The scheme of taxation provided for this company in its charter is a broad one, and, in my judgment, the tax of one-half of 1 per cent. on its net earnings embraces all the taxation it was intended should be exacted of this company.

The term "stock" as used in the fifteenth section of the charter has been held to mean capital stock, and that the term "capital stock" embraces the franchise of the company as well as its physical property can hardly admit of question. Without the franchise there would be no capital stock, properly speaking. The mere inert mass of physical property would be valueless without the life imparted to it by the franchise; that is, the right to maintain and operate a railroad and to take tolls. The tax provided by the charter is upon net earnings. Earnings are only obtained by the operation of the property, and this operation is by virtue of the powers and privileges granted in the charter, and these powers and privileges so granted constitute the franchise. Judge Bleckley, with his usual aptness, expresses this idea in his opinion in the case of City of Atlanta v. Grant, Alexander & Co., 57 Ga. 340–346, as follows:

"The franchise to be a corporation is what constitutes an artificial person. That is breadth or being, and not property. You cannot sell it, any more than you can sell the life of a man. But things, and the right to use things for profit, are property, whether in the hands of a corporation or of a natural person. A chartered railroad is property. The rights and privileges conferred by charter to use it as an instrument of transportation are also property; for they adhere to it as accessories or incidents, and add to its value. Indeed, they give it its chief value. Without them the railroad, as such, would be almost or quite useless. To own it would be like owning a horse with no right to ride him or drive him, no right to put him to labor. This would be owning materials merely—the iron and timbers, the earth and masonry, of the railroad; or the hide and flesh and bones of the horse."

No opinion whatever is expressed on the effect otherwise of the franchise tax act of the Georgia Legislature of 1902. It is only held here that, as the scheme of taxation provided in the charter is to tax "stock" (meaning capital stock) by taxing the net earnings, it necessarily covers and embraces the franchise. The decision does not go beyond this particular case and the charter of this company. It is always a delicate matter for courts to interfere with the tax acts of the state, and this interference should not be extended beyond what is required by the case made.

Considering the tax clause of the charter under consideration in the several aspects argued by counsel and discussed by the court as above, or considering it more generally and as an entirety, it is clear that it was the intention of the Legislature to provide a full and complete system of taxation for this corporation, and that it embraces its whole liability for taxation. Whether the taxing clause in the charter of the Georgia

Railroad & Banking Company was a wise or an unwise enactment, it is conceded that when we reach its true intent and meaning the clause with such intent and meaning attached to it constitutes a contract between the state and the company; and the Attorney General very frankly and properly concedes this in his brief. The language of his brief renders unnecessary any citation of authority or further discussion of the question. It is as follows:

"In order to simplify the case, and meet squarely the issue raised, let it be remembered that the state, at the threshold of the argument, concedes that the Legislature, at the time that complainant's charter was granted, had the right to forever exempt or limit the tax rate of the corporation. Therefore the state concedes the right of complainant to insist that the provision in its charter is a contract, and that all rights conferred under the provision in question should be faithfully respected and enforced. There are no differences between us as to the duty of the state to be bound by the provisions of the charter it granted, for it is conceded in the light of authority its charter is a contract, and that it could not impair it, even if it wished to do so, by virtue of the inhibition of the federal Constitution; but there is a difference between us, which difference consists in 'What is the grant?' So that, when we reach the intent of the lawmakers of the state in 1831 as to what should be the limit of taxation of this corporation, that is the limit at this time. What, in my judgment, this limit is, has been stated above."

This question can never arise as to charters granted since January 1, 1863, when the Code of Georgia went into effect, which declared that in all cases of private charters thereafter granted the state reserved the right to withdraw the franchise, unless such right is expressly negatived in the charter. This is strengthened by the provision of the Constitution of 1877 against irrevocable grants of special privileges and immunities. But as to charters granted prior to January 1, 1863, they must stand as written.

The rule in determining the meaning of statutes exempting from or limiting taxation is strict construction against the grant and in favor of the government; but by such strict construction is meant that the language of such act will not be extended beyond its necessary meaning, and not that its necessary meaning shall be ignored and defeated.

Counsel in this case have not differed as to what part of the railroad lines is covered by this taxing clause in the charter, so that can be easily fixed in the decree.

As to taxing the accumulations of money, I think the true rule is as expressed by Judge McCay in 54 Ga., as follows:

"As to the surplus kept on hand, or any investments not strictly within the enterprise contemplated in the charter, we are clear that this is taxable. The company is only exempt on the value of its road and its necessary appurtenances, and those appurtenances must be ordinary and usual appurtenances of such an enterprise. Anything in the nature of an investment not within this scope is not exempt. We would not inquire closely into the status of affairs on any particular day, as it may well be that it may have a surplus on hand for a special purpose. But even as a fund to meet contingencies, we think a permanent surplus invested is not covered by the exemption in the charter."

Applying the rule thus stated, counsel should have little difficulty in framing the decree properly in this respect.

The stock subscribed under the act of 1868 authorizing the Clayton Branch is undoubtedly subject to taxation at the ordinary rate. This

court, however, cannot properly determine what is its fair value for taxation. That can be determined in the manner provided in the state law, and as is usual in such cases.

A decree may be entered in accordance with the views herein expressed.